E-FILED
Tuesday, 06 October, 2009  12:48:58 PM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF ILLINOIS

### URBANA DIVISION



OCT – **6** 2009

## CIVIL COMPLAINT

CLERK OF THE COURT
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| **PLAINTIFF CCF** ) | **Case No.** 09-2246 |
| ) | |
| *Plaintiff* ) | |
| ) | |
| **v.** ) | |
| ) | |
| **PARKLAND COLLEGE– BOARD** ) | |
| **of TRUSTEES;** ) | |
| **TRAVIS SOLA;** ) | |
| **THOMAS RAMAGE;** ) | |
| **RANDY FLETCHER;** ) | |
| **MARIETTA TURNER;** ) | |
| **AMY MYERS;** ) | |
| **BRYAN KRALL;** ) | |
| **CAROLYN RAGSDALE** ) | |
| ) | |
| *Defendants* ) | |

## Introduction

1) This action seeks INJUNCTIVE RELIEF, DECLARATORY JUDGMENTS, UNSPECIFIED MONETARY DAMAGES, NOMINAL DAMAGES, and PUNITIVE DAMAGES against the Defendants in their official and individual capacities.

2) Defendants, acting under Parkland College (Public Community College- District #505) anti-harassment "speech code" guidelines, punished Plaintiff CCF, a Parkland student without any due process, in a DISCIPLINARY manner based SOLELY on the "CONTENT" of Plaintiff's PROTECTED SPEECH, which was deemed "offensive," "not polite" and "not respectful." The Plaintiff's cyber-classroom audience was composed of college-aged adults. Defendants then further justified that punishment with

little or no regard for Plaintiff's right to procedural and substantive due process. The unconstitutional actions were either based upon ignorance of the law or utter disregard for the First and Fourteenth Amendments of the *United States Constitution*. Evidence demonstrates that the Defendants in this action boldly, clearly, and repeatedly behaved in a manner inconsistent with well-established law regarding the First Amendment in academic-settings.

3) Plaintiff CCF completed the full grievance and appeal process afforded him by Parkland College's established procedures and policies to complain of violation in college policies. The grievance process was NOT a component of the disciplinary action. The actions of the Defendants jeopardized and continue to jeopardize Plaintiff CCF's established good reputation, based on unlawful actions, and the maintenance of improper negative documentation in Plaintiff CCF's academic record at Parkland College. Plaintiff CCF has an interest in the past and future good reputation of his educational records and his name. Therefore, Plaintiff CCF now comes before this court, praying for objective evaluation and just findings that are in tandem with the First and Fourteenth Amendments and other laws.

4) Plaintiff CCF will pray for PRELIMINARY INJUNCTIVE RELIEF: to stay Parkland College's PUNISHMENT of the Plaintiff; prohibit the Defendants from enacting any further disciplinary actions against Plaintiff CCF based upon his cognitive and emotive components of speech that are protected by the First Amendment; dismiss the findings of the Parkland College's Student Grievance Committee due to lack of procedural AND SUBSTANTIVE DUE PROCESS. Plaintiff CCF also requests DECLATORY JUDGEMENTS that both Defendant Travis Sola's course syllabus for Psychology 203 AND Parkland College's code of conduct / anti-harassment policy be declared unconstitutional by means of the Overbreadth and Vagueness doctrines. As well, Plaintiff CCF requests FINAL INJUNCTIVE RELIEF: ordering reversing DISCIPLINARY PUNISHMENT of the Plaintiff; prohibition of the Defendants from enacting any further disciplinary actions against the Plaintiff based on the speech in this matter; dismiss the findings of the Parkland College's Student Grievance Committee due to lack of procedural and SUBSTANTIVE DUE PROCESS. Plaintiff CCF also requests unspecified monetary damages, appropriate punitive damages and restitution of all costs associated with bringing this action.

5) One Defendant tried to inform the Plaintiff, during the "*educational* hearing" (student grievance hearing), that freedom of speech is "NEVER at the expense of someone else." Another Defendant told Plaintiff that Plaintiff was going to waste a lot of people's time over the freedom of speech "principle." The principles of the *United States Constitution* are vital to our democracy. Plaintiff CCF prays that this

court will uphold this treasured principle - the First Amendment of the *United States Constitution*, as it applies to the protected speech and expressions of college and university students.

## FEDERAL JURISDICTION & VENUE

6) Federal legal basis for complaint: First and Fourteenth Amendments of the *United States Constitution -42 U.S.C. §1983* action. Jurisdiction is based on *28 U.S.C §1331*, a civil action arising under the *United States Constitution* or other federal law.

## PARTIES

**A. Plaintiff, Pro se:**
Full Name:      C. C. Feine (hereafter **Plaintiff CCF**)
Current address:  605 Erin Drive Champaign, IL 61822
                  Tele No. (217) 239.9817

**B. Defendants -**
Each Defendant is being sued in both his/her official and individual capacities as employees of Parkland College.

**Defendant #1:**
Full Name: **Parkland College- Comm. College District #505- Board of Trustees**, Designated Agent: Nancy Willamon
Current Work Address: Parkland College (A-118), 2400 West Bradley Ave Champaign, IL 61821
Tele No. (217) 351.2533

**Defendant #2:**
Full Name: **Travis Sola**
Current Job Title: Psychology Instructor
Current Work Address: Parkland College (D-168), 2400 West Bradley Ave Champaign, IL 61821
Tele No. (217) 353.2159

**Defendant #3:**
Full Name: **Thomas Ramage**
Current Job Title: President, Parkland College
Current Work Address: Parkland College (A-119), 2400 West Bradley Ave Champaign, IL 61821
Tele No. (217) 351.2231

**Defendant #4:**
Full Name: **Bryan Krall**
Current Job Title: Chairperson, Student Grievance Committee
Current Work Address: Parkland College (L-230), 2400 West Bradley Ave Champaign, IL 61821
Tele No. (217) 353.2042

**Defendant #5:**
Full Name:  **Randy Fletcher**
Current Job Title:  Dean, Academic Services
Current Work Address: Parkland College (A-113), 2400 West Bradley Ave Champaign, IL 61821
Tele No. (217) 373.3709

**Defendant #6:**
Full Name:  **Marietta Turner**
Current Job Title:  Dean, Student Services
Current Work Address: Parkland College (A-115), 2400 West Bradley Ave Champaign, IL 61821
Tele No. (217) 351.2505

**Defendant #7:**
Full Name:  **Amy Myers**
Current Job Title:  Chairperson, Social Sciences Department
Current Work Address: Parkland College (D-178), 2400 West Bradley Ave Champaign, IL 61821
Tele No. (217) 351.2385

**Defendant #8:**
Full Name:  **Carolyn Ragsdale**
Current Job Title:  Member, Student Grievance Committee; Instructor, Health Professions
Current Work Address: Parkland College (L-132), 2400 West Bradley Ave Champaign, IL 61821
Tele No. (217) 373.3746

# FACTS OF CASE

7) On, 10-13-2008, Plaintiff CCF, an American, by birth, began an 8-week compact Abnormal Psychology 203 course (16-week course completed in half the time) at Parkland College, which was offered as an online internet course, instructed by Defendant Travis Sola. The course ended on 12-5-2008. Plaintiff had taken numerous other courses at Parkland College and will take other courses after resolution of this matter. Plaintiff CCF was a concurrent full-time student at the University of Illinois and worked part time. Plaintiff CCF had never been the subject of ANY disciplinary action in ANY academic or employment setting. Plaintiff CCF has never been in trouble with the law, save one speeding citation.

8) NONE of the Defendants have ever labeled Plaintiff's written words as: threatening, amounting to "fighting words," a "breach of peace," disruptive to the classroom environment, violent, obscene, vulgar, lewd, profane, defamatory, harassing, discriminatory or as interfering with the rights of others. The action taken against Plaintiff has been classified by Parkland officials as a "disciplinary action."

9) On 11-1-2008, Plaintiff CCF wrote a response to a thirty-one year old White female student's (hereafter 31-WFS) post. The Plaintiff did not intend to demean 31-WFS or create a personal attack against her.

The Plaintiff did not use any profanity, lewd, obscene, or vulgar language, made no threats, and ended his writing with the word "Respectfully."

> "Re: Re: Many changes        [Plaintiff CCF] at 11/1/2008 8:24 PM
> Hi Emily,
>  As I read your well-composed discussion posts, I find myself trying to relate much of the information to the topic at hand. You start your response to Matt's discussion post, with Fromm and Milgram. After that, you profusely scribe with what appears to be personal philosophy without much relevance to the initial poster's APPARENT intent.
>
> We're all filled with personal opinions, ideas and constructs about how the world and people ought to be. But, I think that we're expected to temper such with prudent and reliable information from our readings or other sources, at least loosely related to the discussion subjects of each module. I suppose that my point, VERY RESPECTFULLY, is that I am having a difficult time understanding the relevance of your response to Matt's post or in general to this week's discussion. Again, they are extremely well-written and lengthy, but are they effective responses to the assigned exercise?
>
> Respectfully,
> [Plaintiff CCF]"

10)     Shortly before Plaintiff CCF wrote that post, 31-WFS had written another response iterating her style:

> "Re: Re: Survival of the Fittest
> [31-WFS] at 10/31/2008 9:50 AM
>
> 'I agree with you when you said that for most people 'the overemphasis on the role of psychosocial factors in treatment doesn't lead to minimizing the physical therapies followed.' [a sentence from another student's post]
>
> Disclaimer:
> I used to run a discussion board online, and one of my huge pet peeves was when people would play devil's advocate just to get a response. It's considered bad netiquette (or, if you prefer, 'trolling'), because it's difficult enough to pick up on subtle irony or tease the meaning out of carefully nuanced arguments when people aren't deliberately misrepresenting their actual opinions. On the other hand, it can be a useful writing exercise to claim strong support for a position you disagree with. It also appeals to my slightly ornery nature. More to the point, the prof requested it directly in the last discussion board. So the position that I'm arguing may or may not be the position that I actually hold... I'm arguing against myself more for the sake of exploring the topic than anything. My original post deliberately argued for something I think is absolute hogwash in the hopes that someone might call me on it.
>
> I think the key here is in the word 'overemphasis', and I'll gently put the third wall back up in place here while I resume my role as the defender of a position that is (from my actual perspective) essentially indefensible.
>
> edited by [31-WFS] on 10/31/2008 2:58 PM" (31-WFS responding to another student)

11)     Defendant Sola emailed the Plaintiff on 11-2-2008. Sola wrote:

> "I am a little concerned that a few of your responses can be read as *combative*, rather than collaborative. ... Let's take, for instance, your post to [31-WFS] last night. While you *appropriately praised* her writing skills and indicated twice that you were trying to be respectful, your criticisms did

not point out specifically what was irrelevant or groundless about her response to Matt or her responses in general. These kinds of broad criticisms can be misinterpreted as an attempt to be *mean-spirited and unfair....*"

12)   Plaintiff CCF responded to Defendant Sola's email and explained why he personally reacted to 31-WFS's post and that he was annoyed that 31-WFS was continually browbeating other classmates with her unrelated tangential incoherent philosophies about the World, and that was the basis of asking about the relevance of 31-WFS' writing. Plaintiff did not intend or expect that his reply message to Sola would be shared with 31-WFS. Plaintiff APPEARED to be agreeable and to APPEARED to receive Sola's message as constructive criticism for the sake of expediency in settling the issue, the first time. Defendant Sola's arbitrary and personal whims quickly altered Plaintiff's mindset. Defendant Sola again responded to Plaintiff CCF's message on 11-04-2008:

> "I admire how seriously you take your studies and I appreciate your contributions to the class. Also, your posts generally do come across as very respectful. Thank you for thoughtfully considering my concerns. A couple of things I want to emphasize. First, I, like your U of I instructor, also "demand precise arguments and evidence" or, in other words, ask students to think critically. So please continue to think critically in this course.
>
> Second, part of what I mean by collaboration is sharing arguments and evidence in order to reach a better understanding of the topics. If we only tear each other down and don't offer other ideas and evidence, we cannot progress and learn from each other. As I mentioned in my previous email, in your responses you should try to specify exactly where you find a weakness in argument (in a *respectful and humble manner*) and provide your own counterargument and evidence."

13)   On 11-5-2008, due to Defendant Sola's messages that Plaintiff's messages could be deemed mean-spirited, combative and unfair, Plaintiff CCF wrote to another female student whose writings he had responded to the most and she responded.

> ------------------------------ Original message ------------------------------
> "Date: 11/05/2008 17:30:04
> From: {Plaintiff CCF]
> To: BENSON, LORIE
> Subject: Just a quick note...
> Hi Lorie,
> I just wanted to drop you a note about my responses to your posts. It is never my intent or desire to be rude or condescending. I realize that last week, that I may have appeared mean. I'm not, and didn't mean to come off that way. I like the way that you get straight to the point.
> [Plaintiff CCF]"
>
> "From: lbenson@stu.parkland.edu
> To: [Plaintiff CCF]
> Date: 11/05/08 05:42 pm
> Subject: Angel: RE: Just a quick note...
> Hi!
> No problem. Don't worry. I didn't think you were mean or anything!"

14) On, 11-5-2008, Plaintiff CCF completed two other posts and again made positive comments about two other students' writings. Plaintiff CCF made no mention of 31-WFS, had no intent of communicating anything about 31-WFS and simply completed his assignment. Recall that Defendant Sola wrote that "[Plaintiff CCF] appropriately praised her [31-WFS] writing skills." On 11-6-2008, Defendant Sola again wrote Plaintiff CCF an email.

> "... Finally, you emphasized your preference for the style of Anna's and Lorie's responses. This comes across as a *thinly-veiled attack* once again on the style of [31-WFS'] responses, which are *clearly much more elaborate and expansive than Anna's and Lorie's....*"

15) The Plaintiff did not create an attack upon 31-WFS. Defendant Sola's action here did not consist of pedagogical coaching, but rather an arbitrary rebuke of Plaintiff CCF's opinions and capricious replacement of Plaintiff's opinion, with that of the Defendant's. Defendant Sola reprimanded Plaintiff CCF again, based on non-existent worst-case scenario of Plaintiff CCF's possible intended interpretation of written speech and expressions. This was the second warning. Members of the Student Grievance committee needlessly challenged Plaintiff as to whether Plaintiff was warned or "coached."

16) On 11-7-2008, Plaintiff CCF emailed Defendant Sola's supervisor, Defendant Amy Myers and Dr. Linda Moore, Vice President for Student Services (not a Defendant) and complained about Defendant Sola's continued berating of Plaintiff CCF's opinions and style. Defendant Myers responded to Plaintiff CCF on 11-7-2008.

> "[Plaintiff CCF],
> Thank you for getting in touch with me about this. You did the right thing. ... In my experience, conflict that arises during email interactions is very difficult to resolve via email because of the many ways the 'tone' of a message can be interpreted. Please let me know what you think about meeting.
>
> Amy Myers"

17) During the week of 11-24-2008, the Plaintiff completed three required critical-thinking opinion-writings for "Module 7: Critical Thinking-Discussion Board" assignment. The topic related to the change in different rates of psychological disorders of boys and girls as they matured into men and women. Plaintiff continued reading other posts and came across a response post written by 31-WFS. Plaintiff CCF felt that 31-WFS' writings were demeaning to men, and blamed men as the cause of female psychological problems. 31-WFS discussed teenage rape, molestation of elementary school girls, and joked of her adult male friends dating "12-year old" girls. The Plaintiff found it odd that 31-WFS who claimed to have been raped as a teenager, would joke about the issue. Plaintiff CCF did not complain to

anyone; the Plaintiff followed the words of former Justice Louis Brandeis, "If there be time to expose through discussion the falsehood and fallacies, to avert the evil by the processes of education, the remedy to be applied is more speech, not enforced silence." (BRANDEIS, J., Concurring Opinion- 274 U.S. 357, Whitney v. California)

18)   On, 11-28-2008 and 11-29-2008, Plaintiff CCF wrote critical thinking discussion board posts that were later arbitrarily deemed by Defendant Sola to create a personal attack, be impolite, insensitive, not respectful, inappropriate behavior and offensive. Plaintiff CCF's writings were a direct response to 31-WFS' opinions, evidence and argument. Plaintiff CCF had no intent of harassing 31-WFS, disrupting the classroom, or discriminating against anyone on any basis. Plaintiff CCF intended to counter 31-WFS' written opinion and to inform readers of his own. According to Parkland College rules under "freedom of expression in the classroom," Plaintiff was entitled to express his opinions without fear of reprimand or punishment for his stated opinions or beliefs, when they were germane to the topic. 31-WFS used evidence of her personal issues to support a claim of general psychological discord in most other women. Plaintiff felt that the center of her argument blamed men for the psychological problems of women and painted men rather negatively based on 31-WFS' personal experiences. Personal experiences are anecdotal experiences and do not justify hasty generalizations. Plaintiff attempted to form his opinions around that concept. It was the Plaintiff's opinion that 31-WFS presented her argument from a "victimist" perspective -an angle to garner sympathy. Plaintiff's use of 31-WFS' evidence only in a vein to refute her argument did not create a personal attack (ad hominem). The two engaged in sustained debate, and 31-WFS further engaged others on the same matter. 31-WFS demonstrated that her classroom experience was not impaired as she continued to refine her argument.

19)   Plaintiff's punished written speech follows:

> "Re: Re: Increased pressures
>  [Plaintiff CCF] @ 11/28/2008 7:40 PM Reply
>
> No one should be physically or sexually assaulted, period.
> Rape and unlawful physical assaults are unacceptable.
>
> The "victim role" perspective hijacks Matt's discussion of women having higher levels of stress as a result of striving for equal rights and equal treatment. Individual sad tales of lives filled with revelations of victimization do more to establish individual psychopathology than it does to support generalizations. [31-WFS'] life tales show us a snapshot of life activity through a negative prism. Might it be faulty to view life through such a negative viewpoint? Might maladaptive thoughts and assumptions result leading to dysfunctional life patterns, which result in higher levels of reported psychological discord?

Perhaps, someone that continually goes through life presenting as a "victim" simply seeks to garner sympathy and the likes that are associated with this "sick role." Perhaps, the "victim" helps to recruit other perceived "victims," and they go through life interpreting most things as negative (maladaptive assumptions) and reacting in inappropriate manners. As this repeats itself, and the victim learns to fine tune her message to others and to interpret innocuous comments and actions as dangerous, this could lead to unnecessary levels of stress and perhaps lead to mental health issues that might not otherwise exist. So, perpetual "victims," might have an impact on their group having higher levels of psychological disorders. Yes, people are sexually or physically abused. That is wrong, period. But, the eternal role of victim, as with the sick role may define separate and distinct maladaptive assumptions and behaviors, which, as we know are characteristic of some mental health disorders.

So, if [31-WFS'] theme of women as victims is proper, must we assign women to a 'sick/victim role' to explain their higher numbers of REPORTED mental health issues? I think not. I believe that women and men are probably closer in levels of adult psychological disorders, but women are more likely to report their issues than are men.

'Here are some examples of the behavior and thinking of a 'victim'.
1. A 'victim' is someone who believes they have no control of their life
2. A 'victim' believes that he/she can do nothing right
3. A 'victim' believes that no-one really cares for them
4. A 'victim' is always negative
5. A 'victim' is waiting for someone to rescue them
6. A 'victim' puts pressure on their partner to make everything all-right for them
7. A 'victim' opts out of life
8. A 'victim' is fearful
9. A 'victim' is insecure
10. A 'victim' is usually depressed or anxious
11. A 'victim' feels under constant threat of something bad happening
12. A 'victim' sabotages positive thinking and behavior
13. A 'victim' is distrustful
14. A 'victim' waits for disasters to occur
15. A 'victim' will have emotional problems
16. A 'victim' may turn to drugs or alcohol as a means of escape
17. A 'victim' will be isolated from friends and family
18. A 'victim' will withdraw from real life.' (Source #1)

'Our society sends out the message that women need men and babies to be happy;' (31-WFS)
Is this a product of maladaptive assumptions? The contemporary mainstream media and other anecdotal evidence demonstrate that many women are achieving great successes and happiness despite the absence of significant men in their lives. (Plaintiff CCF)

'…When the men trade them in for a newer model and skip town.' (31-WFS)
Is this a product of maladaptive assumptions? (Plaintiff CCF)

'When you know that your daughter's second grade classroom picture includes perhaps one or even two future victims of emotional or physical assault who have a y chromosome….' (31-WFS)
Is this a product of maladaptive assumptions? Is it good to go through life always anticipating that bad things will happen? (Plaintiff CCF)

'One of my best male friends jokes around about the paradox of dating in your mid-late teens, if you're straight: to find a girl who doesn't have massive "issues", you need to go for 12-year-olds, but if you date them when they're 12, you're going to give them serious issues.' (31-WFS)
Is this a buddy-team of negative thinking and maladaptive assumptions? (Plaintiff CCF)

Source #1: http://www.selfgrowth.com/articles/The_Victim_Role.html" (Plaintiff CCF)

20)   The "sick or victim role" is a position wherein one intentionally uses sympathetic information or situations in order to gain sympathy from others. Plaintiff's use of the terms was related to 31-WFS evidence and the specific information covered in the course.  Maladaptive assumptions/beliefs are :

> "—attributions, appraisals and irrational beliefs—are created by our experiences and cultural teachings. These belief systems (interrelated set of beliefs) function as mental/perceptual "filters" through which we view the world, the future and ourselves, which ultimately affects the state of our physical, psychological and spiritual health.
>
> There are many reasons why humans develop and maintain maladaptive beliefs, and the negative emotions and behaviors accompanying them. They include the following (adapted from Albert Ellis book, "Reason and Emotion in Psychotherapy" pp. 381-414)" (http://stanford.wellsphere.com/healthcare-industry-policy-article/why-people-develop-persistent-maladaptive-beliefs/444859)

21)   31-WFS wrote a response and then the Plaintiff then wrote the following.

> "Re: Re: Re: Re: Increased pressures
> [Plaintiff CCF] @ 11/29/2008 2:26 PM Reply
>
> Although, the 'sick role' is off target in this discussion module, I'll engage it more on the possible premise that personality disorders (Chapter 16, part of this module) also place folks into a 'sick role.' If everyone who had ever been victimized-imagined, real or perceived remained in negative, the World would stand still. The fact that some alleged victims repeatedly remind others (complete strangers) of negative events that occurred nearly twenty years ago should cause others to question the motivations of the alleged victim. Does the victim explain how the main negative event has genuinely impacted her life? Or, are there clues that the victim is playing the 'sick role?' If a victim continually highlights negative dramatic events to garner sympathy from the 'sick role,' that she has experienced, it is also acceptable to question the genuineness and veracity of such events.
>
> Examine that the victim goes through great lengths to highlight and establish her life as a 'sick role' victim, and then objectively ponder the reasons why she does this. Is it a ploy to garner sympathy from the audience or a means to show how she has overcome adversity? The answer lies in the victim's response that 'positive thinking and harsh reality collide, and occasionally harsh reality wins.' Examples of what some could argue support the sick role status are in the many details. For example, it's important for us to know that the woman with whom the victim lives was also an alleged teenaged rape victim and that the victim's roommate's ex-husband subjected the latter to serious emotional abuse for almost ten year[s]. Does this add to the establishment of a 'sick role?' Is this the main theme? Next, it was important for us to know that the victim's daughter has ADHD. Why? Is it part of a theme? Does it support the status of a 'sick role?' Then, we slyly come to learn that the victim's mother can't marry what we assume is the mother's same-sex partner. I STRONGLY believe that Homosexuals are entitled the EXACT same rights enjoyed by heterosexuals! But, so what? How does it fit into the theme? What's the point, does it somehow contribute to this 'sick role?' And, the victim adds comments about her daughter's daddy verbally cutting the victim down. And? Should this gain additional sympathy for the "sick role" status? Is the theme fortified by drawing a parallel to this module's case study?
>
> The harsh reality is that bad things happen, quite randomly and perhaps frequently. That's life. Some people wish to wallow in self-pity, years later and form relationships that serve to continually rejuvenate and perhaps boost the negative feelings and self-pity. While, others choose to accept reality, cope with it, and use the negatives as forces to propel them to achieve and move forward in life. Victims who are positive take charge of their lives and regain control while those who are

negative remain stuck in negative, blaming their lives on bad fortune, refusing to take control. The true harsh reality is that "s#$+ happens," at some point, move on or stay stuck in the 'sick role.'" (Plaintiff CCF)

22)   31-WFS wrote another response without the sympathetic information. But, she wrote that she agreed with Plaintiff that she had created a victimist or sympathetic theme. That was one of Plaintiff's main critical points about 31-WFS argument. Three days later, Defendant Sola arbitrarily and capriciously punished the Plaintiff's written speech and expression, through an email on 12-2-2008.

> "I previously told you to make sure your posts c*annot be perceived as combative*, and instead work to *make them more respectful and collaborative in spirit*. In these posts, your writing clearly steps over the line and *makes a personal attack*.
>
> As you know, the course syllabus clearly points out that personal attacks are *inappropriate postings* on this discussion board. Because you were previously made aware of these expectations for this discussion board, 10 points will be deducted from your Module 7 Discussion score. I talked with Social Science and Human Services department chair about your discussion responses and will copy this email to her as well. In addition, *any more inappropriate posts on the discussion board will be removed and further disciplinary actions will be pursued*."

23)   Plaintiff CCF was afforded NO due process of any kind related to this disciplinary action. Defendant Sola punished Plaintiff CCF on 12-2-2008.Defendant Sola's action reduced Plaintiff CCF's particular section grade from an "A" to a "D" based solely on a finding that Plaintiff's written opinions were "inappropriate," "offensive", "not polite in tone," not civil and not "respectful." Plaintiff CCF had a property interest in all of his scores and grades. The Plaintiff CCF followed the LAWFUL directives of Sola's listed questions for critical thinking and Sola's specific directives for "Devil's Advocate." Defendant Sola's reminder to Plaintiff CCF that "I previously told you to make sure your posts cannot be perceived as combative, and instead work to make them more respectful and collaborative in spirit" creates a nearly impossible task. It is a fact that Plaintiff CCF could not control or know the dynamic mindsets all of the other adults in the course. Therefore, it would be a daunting mission for Plaintiff CCF to continually predict how other students might perceive his written opinions.

24)   On 12-2-2008 Plaintiff CCF contacted Defendant Amy Myers by telephone to complain of Defendant Sola's actions. Defendant Myers explained that she supported Sola's actions because Plaintiff had been warned twice. Later, Defendant Myers wrote, in an email to Plaintiff CCF, dated 12-2-08, "Earlier in the semester, Mr. Sola clearly stated his standards for what constitutes *acceptable and unacceptable behavior* in a discussion forum, and *your recent postings are unacceptable….*"

25)   On 12-2-2008, Plaintiff CCF contacted Defendant Randy Fletcher, Dean of Academic Services to complain about Defendant Sola's actions. Defendant Fletcher also supported Defendant Sola's actions,

noting that Plaintiff had been warned twice about Plaintiff's "behavior." Defendant Fletcher also
dismissively told Plaintiff that Plaintiff would waste a lot of people's time over the issue, based on a
matter of principle.

26)    On 12-8-2008, Plaintiff CCF filed a formal written grievance, with Dr. Linda Moore, vice-president
for Student Services, against Defendant Sola- claiming that Sola violated Plaintiff's protected rights and
college guarantees. Defendant Sola violated Plaintiff CCF's First Amendment right to "freedom of
speech." Sola violated Parkland College's "Protection of Freedom of Expression" policy. Sola violated
Parkland College's "Protection Against Improper Academic Evaluation" policy. Defendant Sola also
violated a second Parkland College "Freedom of Inquiry and Expression" policy.  Plaintiff CCF listed
"pages 41-44 of the *Parkland College Student Policies and Procedures Manual, Fall 2008*" and the First
Amendment of the *United States Constitution* as the source of the policies, which Defendant Sola had
violated. The grievance was in transit (internally at Parkland College) from Dr. Moore's office to
Defendant Myers from 12-8-2008 until 12-11-2008 (Monday through Thursday). On 12-11-2008,
Defendant Myers, Sola's supervisor, signed off on Plaintiff's written grievance. It is assumed that
Defendant Sola also received Plaintiff's grievance on that date.

27)    On 12-11-2008, 31-WFS filed a "Harassment/Discrimination Complaint" against Plaintiff CCF
alleging gender and disability discrimination, and that Plaintiff created a "Hostile Learning
Environment." 31-WFS' complaint indicates that she became more troubled and filed a complaint *ONLY*
after Plaintiff, according to 31-WFS, indicated his "belief that his postings were appropriate and that his
rights were being violated…." 31-WFS' proposed resolution was that Plaintiff read a letter and
"formulate a response demonstrating that his words and actions could have serious consequences and
that he has genuine remorse…." In the letter, 31-WFS wrote "I can only assume, based on your most
recent disclaimer regarding "capricious, arbitrary, or unlawful actions by our instructor that you feel that
your posts this semester were not at all *offensive*. That being the case, I feel compelled to escalate the
situation." 31-WFS wrote that she did not understand how it was fitting for someone, during a critical
thinking exercise, to challenge or discuss the evidence that she presented to support her arguments and
claims. The language used by 31-WFS in her complaint is eerily similar to that used by Defendant Sola
during the so-called pedagogical-coaching, and the timing of her complaint creates questions. In 31-
WFS' complaint, she *again* became the unquestionable older wise student whose opinions and style were
supposedly supreme. 31-WFS wrote:

"Implying that someone's posts are rash, unfounded, and way off-topic is *not polite*.... It is best to *frame your opinions in a way that encourages debate* by responding to that person directly.... Avoiding discussion with me was a *subtle breach of etiquette*.... You are free to doubt the authenticity of the experiences I chose to share in this class, and *you are free to privately wonder* about my reasons for doing so.... *I was offended* by your accusations, and justly so. In the real world, comments like that made in any workplace setting, particularly *after you have been warned twice to stop*, would be grounds for dismissal.... In light of your insinuation that he [Defendant Sola] was violating your rights by *enforcing the rules that are very clearly spelled out in the syllabus*, I see no reason to believe that you will not go into your next class with precisely the same *argumentative and disruptive approach*...."

28)    On 12-15-2008, Defendant Marietta Turner telephoned Plaintiff regarding 31-WFS' "Harassment / Discrimination Complaint." Defendant Marietta Turner advised Plaintiff CCF that, if Plaintiff apologized, 31-WFS' harassment complaint would go away. An apology would have eviscerated Plaintiff's grievance regarding violations of his First Amendment Rights and Parkland College protections. Plaintiff CCF did not agree to apologize. There is evidence that Parkland College was aware of the potential for conflict of 31-WFS' complaint interfering with Plaintiff's grievance.  Plaintiff does not know of what disabilities 31-WFS suffers, but her disabilities do not subjugate Plaintiff's First Amendment rights.

29)    On 12-19-2008, Dr. Linda Moore advised that 31-WFS' "Harassment/Discrimination Complaint" would be placed on hold until the resolution of Plaintiff CCF's grievance process.

30)    On 1-12-2009, Defendant Sola responded to Plaintiff's grievance. Defendant Sola denied any wrongdoing. Sola wrote- "*Personal attacks* are *inappropriate* on the discussion board for the sound pedagogical reason that they do not meet the academic standards of *respectfully discussing* and critically thinking about the assigned abnormal psychology topic." Dissecting and refuting personal evidence that a writer uses does not establish a personal attack.  Plaintiff did NOT create a personal attack. Sola uses the phrase "personal attack" in a manner related to "respectful" versus "disrespectful." Defendant Sola implies that only his personal arbitrary content-based restriction speech and expression is allowed. First Amendment rights apply in the classroom. Defendant Sola also wrote in his response-

".... As a psychology instructor at Parkland College, I do not believe it is appropriate for me to address those allegations. However, it is my understanding that neither the State of Illinois nor the *United States Constitution* guarantees an unfettered right to speak at any time about anything in any manner....

Therefore, in conclusion, I did not violate any Parkland College student right as the course instructor for the Fall 2008 Psychology 203-941 course. Rather, as the course instructor, I acted with legitimate and appropriate authority for setting academic standards and assessing student performance on the basis of those standards alone. Furthermore, the academic standards of my Psychology 203-941 course are consistent not only with the *Parkland College Student Policies and Procedures Manual*, but also

the mission and purposes, general education goals, and statement of core values for Parkland College."

31)   Plaintiff CCF immediately submitted the appropriate documentation requesting a student grievance hearing. Plaintiff and his advocate continually communicated with Defendant Bryan Krall, chairperson for the Student Grievance Committee about procedural issues. Defendant Krall was not very familiar with the policies, as this was his first time chairing a hearing. Defendant Krall stated that Plaintiff could not argue that his First Amendment rights were violated because it wasn't listed in the student manual.

32)   On 1-30-2009, Defendant Krall responded to one of Plaintiff's question about Plaintiff CCF questioning the instructor-Defendant Sola during the planned Student Grievance hearing.

> "Hi [Plaintiff CCF],
>
> 'Will the instructor be REQUIRED to answer reasonable questions related to the incident(s) and his grading policies?' [Plaintiff CCF posed this question on 1-29-2009]
>
> If the committee deems a question reasonable and relevant then the person to whom it is directed at will be asked to answer the question by the committee. If they still refuse to answer the question, then the committee has the right to take that into account when reaching a decision.
> -Bryan"

33)   On 2-23-2009, Plaintiff CCF attended a Student Grievance hearing. Defendants Ragsdale and Krall both pointed out how Plaintiff's writing was either "offensive" or "raised a red flag" as Plaintiff presented his case. Defendant Ragsdale expressed how she was personally offended by Plaintiff's use of the words "profusely scribe" and "personal philosophy without prudent or reliable information" because Plaintiff had started with, according to Ragsdale- "31-WFS 'comma,'" in his 11-12008 post.  In fact, Plaintiff began that post with "Hi 31-WFS," as a social courtesy, as was his practice in his responses. Defendant Ragsdale's authoritatively tried to educate Plaintiff that freedom of speech is not at the expense of another person. Numerous procedural issues arose, whenever Parkland's rules were ambiguous. Defendant Krall reached arbitrary decisions in favor of Defendant Sola on each issue.

34)    On 2-24-2009 and 3-2-2009, Plaintiff CCF complained, in writing to Dr. Linda Moore, Defendant Ramage and the Defendant Board of Trustees (via Nancy Willamon, designee for the Board of Trustees) about the procedural errors and unfairness that occurred at the Student Grievance hearing. Plaintiff CCF requested a new hearing. Plaintiff's requests were denied.

35) On 2-27-2009, Dr. Linda Moore, vice president for Student Services denied Plaintiff's request for a new hearing. Dr. Moore was mystified that Plaintiff failed to remain at a hearing where he was continually told that his writing was offensive and improper as he attempted to present his case. There was no point

in staying since the committee had clearly demonstrated that Plaintiff was wrong. This was not an impartial tribunal. Plaintiff's inability to question Defendant Sola, Defendant Ragsdale's outlandish and boisterous negative comments about Plaintiff's writings combined with Defendant Krall's negative comments and Krall's arbitrary and biased decisions offering the committee and Defendant Sola two separate opportunities to re-schedule, but denying such to Plaintiff, left no room for mystery as to why Plaintiff could no longer tolerate the "educational hearing." Dr. Moore described Plaintiff's advocate as an impediment to Plaintiff's presentation, which Dr. Moore described was "well-prepared and very able to articulate your concerns and line of reasoning." Plaintiff's advocate prepared Plaintiff's entire presentation, and guided Plaintiff through it. The advocate's vocal guidance to Plaintiff was not loud or improper. As faculty members of the committee became somewhat antagonistic, negatively judgmental and accusatory of Plaintiff's writings, Plaintiff's advocate began asking questions of the chairperson and directed the Plaintiff to pose specific response questions of committee members. Plaintiff tried to defend his written words and opinions against that of the faculty members who, according to Defendant Ragsdale had to rely on the "professional judgment of the instructor teaching the course." The committee wasn't explaining how Plaintiff had gotten facts wrong or cheated on an exam; the faculty members were explaining how Plaintiff's opinions were offensive, divergent or "too assertive." Why not just save time and tell Plaintiff on his arrival- "we've made a decision." The "your opinion is bad" power imbalance that three out of four faculty committee members created added to the unfair and biased tribunal. An advocate must advocate when it is clear that his party is being treated improperly, and his party's right to an impartial hearing are jeopardized. The recording from the hearing and subsequent findings demonstrated an "educational hearing" that had already made a decision and there was no need for the Plaintiff to endure further insults regarding his constitutional rights. The accusatory style and judgments by specific committee members increased Plaintiff's frustration to an uncomfortable level. There was no sensible need for Plaintiff to continue to be subjected to such an impartial and antagonistic panel. As evidenced by the audio recording from the hearing, the differences in style and manner of questioning the Plaintiff and that of Defendant Sola are like the tastes of vinegar and a good sweet wine.

36) On 3-12-2009, Dr. Kris Young, vice-president for Academic Services mailed Plaintiff an unsigned report of findings of the Student Grievance hearing committee. A summary of the findings include:

"Travis's [Defendant Sola] approach is developmental in these communications rather than punitive. There is also evidence that may suggest that some posts had been edited by [Plaintiff CCF] after receiving contact from Travis. For example, the original post made by [Plaintiff CCF] was dated

11/05. Travis sent [Plaintiff CCF] an email regarding these postings on 11/06. An edit to the original post was made by [Plaintiff CCF] and dated 11/07. *Although the committee is not accusing the student of unethical behavior regarding the edits made on the original posts, it may call into question some of the evidence presented by the student. ...*

The committee voted unanimously (6-0) that Travis Sola did not violate Parkland College' s "Protection of Against Improper Academic Evaluation" policy. The committee felt that the guidelines laid out in the syllabus are in alignment with Travis's [Defendant Sola] practices. The syllabus clearly states that "personal attacks" are not tolerated. [Plaintiff CCF] admitted in an email that he slipped into a 'personal attack mode.' [Plaintiff CCF] admitted to violating the standards laid out in the syllabus. ...

The committee voted unanimously (6-0 ) that Travis Sola did not violate Parkland College's "Freedom of Inquiry and Expression" policy. The committee felt that this policy does not apply to a classroom setting. The context in this policy seems to apply to student organizations and students expressing opinions aside from within a course."

37)   On 3-13-2009 Defendant Krall appeared to distance himself from the final report, writing: "I largely summarized what the committee wanted to convey in the report. My role in the report was to coordinate the ideas and concerns of the committee in the report. It is largely the committee that authored the report." Defendant Krall was in charge. Defendant Krall participated in berating Plaintiff's written work during the student grievance hearing. Defendant Krall is the ONLY member of the committee heard senselessly mentioning those "questionable" edits of Plaintiff's work. Ultimately, Defendant Krall bears responsibility for its contents and the actions which led to the malicious content of the final report.

38)   On 04-30-2009, the Plaintiff filed a timely ten-page appeal to Parkland College President, Defendant Thomas Ramage and the Board of Trustees, detailing the initial violation of First Amendment rights and Parkland College's protections, policies and procedures. Plaintiff also detailed the many errors and issues which combined to deny Plaintiff CCF appropriate Procedural Due Process and Substantive Due Process.

39)   On 5-7-2009, Defendant Ramage summarily replied.

"Thank you for your letter of April 30, 2009 regarding an appeal of the formal student grievance process. I have reviewed your appeal, the process employed by the grievance committee, and their findings.

I find no cause to reverse the decisions of the committee.

Good luck in your academic endeavors.

Thomas R. Ramage, Ed.D
President"

40)   Plaintiff CCF now presents to this court. Plaintiff CCF brings this civil action against Defendants Travis Sola, the Parkland College- Board of Trustees, Dr. Thomas Ramage, et al. based upon unconstitutional actions by the aforementioned which resulted in real damages to Plaintiff, damages to

his academic reputation, and has the potential for future damages to the Plaintiff CCF. Defendants are being sued in both their official and individual capacities as employees of Parkland College based upon intentional, unintentional and negligent acts which violated the Plaintiff's constitutional rights, as well as failure to perform duties which would have corrected the unlawful conditions to which Plaintiff complained of in a clear, repetitive and reasonable manner, according to Parkland College policies.

## INJURIES

41)   Plaintiff restates and incorporates the above-stated facts herein.

42)   As a result of the above stated facts, Plaintiff CCF suffered a violation of his First and Fourteenth Amendment rights. Plaintiff's academic reputation, in which he has a property interest was tainted and defamed. Plaintiff endured mental anguish, irritability and emotional distress as a result of the sum of the Defendants unconstitutional actions. Plaintiff has endured lost monies as a result of bringing this action. The actions and inactions of the Defendants are the direct and proximate causes of the injuries and constitutional violations suffered by Plaintiff CCF.

43)   Defendant Parkland College -Board of Trustees' is being sued in both official and individual capacities. Defendant Parkland College -Board of Trustees' actions complained of within this claim are direct and proximate causes that lead to the violations of the Plaintiff's constitutional rights and other unlawful actions complained of within.

44)   Defendant Travis Sola is being sued in both his official and individual capacities. Defendant Travis Sola's actions complained of within this claim are the chief direct and proximate causes that lead to the violations of Plaintiff CCF's constitutional rights and other unlawful actions complained of within.

45)   Defendant Amy Myers is being sued in both her official and individual capacities. Defendant Amy Myers' actions complained of within this claim are direct and proximate causes that lead to the violations of the Plaintiff's constitutional rights and other unlawful actions complained of within.

46)   Defendant Carolyn Ragsdale is being sued in both her official and individual capacities. Defendant Carolyn Ragsdale's actions complained of within this claim are direct and proximate causes that lead to the violations of the Plaintiff's constitutional rights and other unlawful actions complained of within.

47)   Defendant Marietta Turner is being sued in both her official and individual capacities. Defendant Marietta Turner's actions complained of within this claim are direct and proximate causes that lead to the violations of the Plaintiff's constitutional rights and other unlawful actions complained of within.

48)   Defendant Randy Fletcher is being sued in both his official and individual capacities. Defendant Randy Fletcher's actions complained of within this claim are direct and proximate causes that lead to the violations of the Plaintiff's constitutional rights and other unlawful actions complained of within.

49)   Defendant Bryan Krall is being sued in both his official and individual capacities. Defendant Bryan Krall's actions complained of within this claim are direct and proximate causes that lead to the violations of the Plaintiff's constitutional rights and other unlawful actions complained of within.

50)   Defendant Thomas Ramage is being sued in both his official and individual capacities. Defendant Thomas Ramage's actions complained of within this claim are direct and proximate causes that lead to the violations of the Plaintiff's constitutional rights and other unlawful actions complained of within.

## CAUSES OF ACTION

### FIRST CLAIM

### Violation of First Amendment Right- Freedom of Speech Clause

51)   Plaintiff restates and incorporates the above-stated facts herein.

52)   Defendants warned, berated and then punished Plaintiff for written speech based on regulations that would have FORCED Plaintiff to alter HOW or WHAT he said, in order to be "appropriate," "humble, and "polite." These were not constitutionally allowed content-neutral restrictions. They were not narrowly tailored prohibitions. The requirements that Plaintiff alter HOW or WHAT he said did not serve a significant government or educational interest. The broad and vague prior restraints effectively sealed other reasonable alternative methods of communication for Plaintiff to effectively convey Plaintiff's opinions. These same restrictions that justified Plaintiff's punishment also chill the protected speech of other Parkland College students through Overbreadth and Vagueness.

53)   That "the committee [erroneously] voted unanimously (6-0 ) that Travis Sola did not violate Parkland College's" freedom of expression policy did not intimidate or usurp Plaintiff CCF's constitutional rights. The arbitrary behavior of the hearing committee and their capricious untruthful findings defy justice. For, the District Court in *Doe v. Michigan* wrote, in finding that the University of Michigan's anti-harassment speech code was unconstitutional because it was both overly broad and overly vague, that:

"Nor could the University proscribe speech simply because it was found to be offensive, even gravely so, by large numbers of people. *Texas v. Johnson*, supra 105 L. Ed. 2d at 360; *Hustler Magazine v. Falwell*, 485 U.S. 46, 55-56, 99 L. Ed. 2d 41, 108 S. Ct. 876 (1988); *City Counsel of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 804, 80 L. Ed. 2d 772, 104 S. Ct. 2118 (1984); *Federal Communications Commission v. Pacifica Foundation*, 438 U.S. 726, 745-46, 57 L. Ed. 2d 1073, 98 S. Ct. 3026 (1978); *Collin v. Smith*, 578 F.2d 1197, 1205-07 (7th Cir.), cert. denied 439 U.S. 916, 58 L. Ed. 2d 264, 99 S. Ct. 291 (1978). As the Supreme Court noted in *Street v. New York*, 394 U.S. 576, 592, 22 L. Ed. 2d 572, 89 S. Ct. 1354 (1969).

It is firmly settled that under our Constitution the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers. See e.g. *Cox v. Louisiana* (I), [379 U.S. 536, 13 L. Ed. 2d 471, 85 S. Ct. 453 (1965)]; *Edwards v. South Carolina*, [372 U.S. 229, 9 L. Ed. 2d 697, 83 S. Ct. 680 (1963)]; *Terminiello v. Chicago*, [337 U.S. 1, 93 L. Ed. 1131, 69 S. Ct. 894 (1949)]; cf. *Cantwell v. Connecticut*, 310 U.S. 296, 84 L. Ed. 1213, 60 S. Ct. 900 (1940).'" (*Doe v. University of Michigan,* No. 89-71683, 721 F. Supp. 852, E.D. Mich 1989)

54)    The Defendants, in both writing and audio recording establish beyond a reasonable doubt that Plaintiff was punished SOLEY because his opinion was deemed "inappropriate," "offensive," "not respectful in tone," "a little too assertive," "stood out as a different sort of message," "nature of it…moving towards the strong end," "raised a red flag," and not "polite" in an online college course that was "attended" by ADULTS. The Plaintiff's written cognitive and emotive speech and opinions have NOT been described as vulgar, obscene, lewd, profane, threatening, harassing, libelous or defamatory. Plaintiff has not been accused of inciting violence, breaching the peace, or disrupting the school environment. An instructor or administrator, acting as quasi-extension of the government, is not entitled to arbitrarily enact prior restraint on the CONTENT of speech under the guise of "pedagogical concerns," when in fact the student's REQUIRED self-determined expressiveness is a component of the academic exercise.

55)    Plaintiff asserts three sources of his protected cognitive and emotive aspects of freedom of expression and speech guarantees- the Freedom of Speech clause of the First Amendment of the *United States Constitution*; *Article 1- Bill of Rights, Section 4* of the *State of Illinois Constitution*; and Parkland College's "protection of freedom of expression" in the classroom located on page forty-two (42) of the *Parkland College Student Policies and Procedures Manual, Fall 2008.*

    "SECTION II — IN THE CLASSROOM

    The instructor in the classroom and in conference shall encourage free discussion, inquiry, and expression. Student performance is evaluated solely on an academic basis, not on opinions or conduct in matters unrelated to academic standards.

    A. Protection of freedom of expression
    Students are free to take reasoned exception to the data or views offered in any course of study and to reserve judgment about matters of opinion, but they are responsible for learning the content of any course of study for which they are enrolled."

56)    Also, Parkland College Student Policies and Procedures Manual, Fall 2008 states:

"Exercise of rights of citizenship

Parkland students are both citizens and members of the academic community. As citizens, students enjoy the same freedom of speech, peaceful assembly, and right of petition that other citizens enjoy, and as members of the academic community, they are subject to the obligations which accrue to them by virtue of this membership. Institutional powers are not employed to inhibit such intellectual and personal development of students as is often promoted by their exercise of the rights of citizenship both on and off campus."

57)   But, Parkland's protections and more importantly First Amendment Rights are *frozen*, not chilled, but FROZEN by another Parkland College Policy, which was directly highlighted as placing a restriction on Plaintiff CCF's and other students "behavior." Parkland officials have written that Plaintiff CCF's speech and expressions transformed into "inappropriate behavior," where in fact his words did not cause any actions, other than emotional responses to his words.

"POLICY 8.30 E-MAIL ACCESS AND USE
The College e-mail system is not an open forum, but rather is owned and managed by the College for the purpose of promoting teaching and learning. Personal use of the e-mail system by students is permitted, but only within the scope of College policy. E-mail includes, but is not limited to, all electronic mail and messaging systems, bulletin boards, mail boxes, web sites, and Internet access.

....As with other professional education communications, e-mail containing offensive and off-color language, vulgarities, obscenities, derogatory remarks or any language that could be construed as harassment or discrimination on the basis of age, race, religion, disability, national origin, or gender will not be tolerated. ..."

58)   The U.S. Supreme Court addressed the issue of educators' actions in prohibiting or punishing speech and expression in *Tinker*.

"But, in our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression. Any departure from absolute regimentation may cause trouble. Any variation from the majority's opinion may inspire fear. Any word spoken, in class, in the lunchroom, or on the campus, that deviates from the views of another person may start an argument or cause a disturbance. But our Constitution says we must take this risk, *Terminiello v. Chicago*, 337 U.S. 1 (1949); and our history says that it is this sort of hazardous freedom - this kind of openness - that is [393 U.S. 503, 509] the basis of our national strength and of the independence and vigor of Americans who grow up and live in this relatively permissive, often disputatious, society.

In order for the State in the person of school officials to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint. Certainly where there is no finding and no showing that engaging in the forbidden conduct would "materially and substantially interfere with the requirements of appropriate discipline in the operation of the school," the prohibition cannot be sustained. *Burnside v. Byars*, supra, at 749." (*TINKER v. DES MOINES SCHOOL DIST.*, 393 U.S. 503 (1969))

59)   Can Parkland constitutionally prohibit ALL "offensive" or "off-color" communications across its internet system (to include online courses and "private" emails) because Parkland claims to own its

*publicly-funded* internet service? "What does Parkland mean by "off-color language? How would a "derogatory remark" be defined by Parkland? How does Parkland adequately define "ANY language that could be construed as harassment or discrimination…?" Does Parkland College's speech code conflict with the First Amendment prohibition of the governmental content-based restrictions on speech?

60)    Some of the topics provided by Defendant Sola for the required critical thinking activities were highly contentious issues. Certainly, in a classroom of adults, there was likely to be lively and polarized opinions and reasoned arguments. There was no need to stifle, censor, reprimand or punish mere opinions, with which Defendant Sola personally found disagreeable. Some of the topics were: psychosocial factors that lead to medical problems; societal treatment and views of those with mental health issues; the legalization of marijuana in America; public perceptions of criminally insane offenders; and, factors that explain the differences between boys/men and girls/women and their psychological disorders. Simply put, these are loaded topics, and polarized opinions are likely to emerge, except where speech is chilled, as it was with Defendant Sola's syllabus and Parkland College's anti-harassment speech code. Some students could express any opinion or content they wished, some could be arbitrarily punished for their opinions if they were arbitrarily labeled as inappropriate or offensive by Defendant Sola based upon Sola's personal opinions. The emotive and cognitive aspects of expressiveness are both essential to freedom of speech and expression, which are not subject to control based on the CONTENT or agreeableness of the message. The First Amendment thrives in its protection of disagreeable speech and expression; we cheer the messages with which we agree- they need no protection. Without both, the world of literature, public debate and entertainment would be robotic, bland, non-robust and detrimental to the great balance of our democracy and venomous to a significant mission of higher education.

61)    Plaintiff's punished words were invidious in the sense that the course requirements required students to directly respond to the writings and opinions of other students. In that sense, it was an invidious and personal academic discourse assignment, and not random personalized speech or expressions directed at particular individuals. Plaintiff never took his classmates' response opinions personally, even though they may have contradicted his strongly held beliefs or opinions. It was critical-thinking discourse among adults. Plaintiff CCF's words examined the writings and evidence of another student, during a critical thinking assignment. Plaintiff CCF did so in a critical thinking manner that was honest, sincere, played "Devil's Advocate" as requested by Defendant Sola, and contained the viewpoints of the Plaintiff CCF as derived from his socio-cultural constructs, socio-political beliefs, possibly his religious beliefs, and

supported by the textbook and other related evidence. Plaintiff had no intent to attack, harass, demean, abuse, offend, ridicule, discriminate against, initiate violence, or in any manner disrupt the cyber classroom or academic environment. Plaintiff's intent was completely irrelevant to Defendant Sola and his co-Defendant-defenders. Plaintiff's written speech and expressions in both cognitive and emotive forms were intended to inform readers of his position regarding 31-WFS' evidence and controversial assumption that men were responsible for the higher levels of psychological problems of women. Plaintiff CCF's writing, taken as a whole is balanced and ultimately demonstrates germane academic social discourse where he concludes by painting women in a more positive light than did 31-WFS. 31-WFS utilized highly personal and sensitive information to try and evidence her point, but the Plaintiff CCF attempted to refute the connection of her evidence to her argument in the vein that the information was poised to garner sympathy and did not add credible evidence to support her position. In short, here we had two adults basically debating a contentious social issue in front of an adult audience; the written speech of 31-WFS was protected, as was Plaintiff CCF's.

62) During the grievance hearing, Defendant Ragsdale stated that Plaintiff's words on 11-1-2008 -"you didn't have prudent or reliable information" was offensive and that "I'm glad that ....we have freedom of speech, but it's never at the expense of someone else."How can such be construed as academically "offensive" when Plaintiff was required to critically examine the work of and then to comment. Plaintiff felt that a writer's assumptions weren't justified- he commented on it. He commented on the lack of evidence. He wrote that he didn't understand what another writer "meant" because it was somewhat incoherent. He questioned in a "creative" fashion, as instructed by Defendant Sola, how the other writer's assumptions were justified, where the "ideas came from," and to some degree- "if this idea is true." Plaintiff did not word his work as direct quotes of the below questions, and was not required to do so. He also engaged in playing Devil's Advocate as required by Defendant Sola. The act of playing Devil's Advocate conflicts with the acts of being humble, respectful, polite, and appropriate. But, as evidence will show- Sola created his own arbitrary definition of the term "Devil's Advocate." Some of the questions that Defendant Sola wanted students to think about in forming their critical responses include:

"EXAMPLES OF QUESTIONS TO ASK YOURSELF WHEN FORMING A POST AND ENGAGING OTHERS IN A DISCUSSION:
1. What is meant by _____?
2. Can I/we give an example of _____ ?
3. Can this question be broken down into smaller questions?
4. Can this question be worded differently?
5. What am I/are we assuming and can it be justified in this case?

6. Do I/we have any evidence for this idea?
7. How can I/we find out if the idea is true?
8. Where did this idea or feeling come from?
9. If this idea is true, what else must also be true?
10. What might someone who disagrees say?"

63)    The thirty-one year-old woman was so offended by the Plaintiff's previous opinions, that she
voluntarily chose to continually locate, open and read discussion board posts written by the Plaintiff,
even posts that were NOT related to her in any way and then complained about his writings. It is not
sensible to continue to voluntarily read or view items that one finds offensive, distasteful, or insensitive.
31-WFS was entitled to avert her eyes or avoid Plaintiff's speech, but she was NOT entitled to have
Defendant Sola reprimand, silence or humble Plaintiff's speech to serve her ideals of "etiquette" or
"netiquette," as 31-WFS calls it. The complainant (31-WFS) was not required to view Plaintiff's words
as part of the course requirements. Plaintiff's writings were not immediately visible to others. Plaintiff's
written opinions were not automatically delivered to her by email or any other means. 31-WFS had to
first log into the course, open up a specific module, click on a specific discussion board, and then find
Plaintiff's name, and most importantly she would have to VOLUNTARILY read his messages. 31-WFS'
ability to fully participate in the course was not affected by anything that the Plaintiff wrote.
Documentation suggests that the instructor's "developmental guidance" of Plaintiff was enacted after
specific complaints by 31-WFS. During such guidance, Defendant Sola demonstrated his arbitrary and
capricious whims and double standards by writing that it was appropriate for Plaintiff CCF to commend
31-WFS' writing skills, but not so for Plaintiff to commend the writing styles of two other students. On
11-6-08, Defendant Sola wrote, in an email to Plaintiff, "This comes across as a thinly-veiled attack once
again on the style of [31-WFS'] responses, which are *clearly much more elaborate and expansive* than
Anna's and Lorie's." Sola's words suggest a preference for [31-WFS] over that of Anna's and Lorie's.
That "second-warning" message from Sola was extremely irritating to the Plaintiff, and Plaintiff
complained to Defendant Myers and Dr. Linda Moore through email on 11-7-2008.

64)    The Plaintiff's words written for academic critical thinking discussion assignment contained no
threatening, disruptive, vulgar, lewd, profane or obscene language; his words did not discriminate against
race, sex, gender, disability, etc. His words did not disrupt the ability of other students to continue their
online classroom activities. Plaintiff CCF's protected speech and expression accomplished his intended
goals of informing readers of his emotive and cognitive expression. Other students and 31-WFS
continued in academic discourse with the Plaintiff throughout the course. In that the critical thinking

discourse occurred wholly across the internet, it is nearly impossible to suggest that Plaintiff's academically-innocuous writing would "breach the peace," or result in "fighting words," or incite imminent violent reactions by those who read his words. At NO time, has ANYONE at Parkland College ever accused the Plaintiff of acting in a disruptive, violent or threatening manner. He has ONLY been accused of expressing offensive, non-humble, disagreeable, impolite and insensitive opinions. Defendant Sola's impaired pedagogical practice and punitive developmental coaxing to guide Plaintiff CCF's PROTECTED SPEECH and EXPRESSION into more "humble," "respectful," "fair," and "civil" manners contravene the First Amendment. Defendant Sola's punishment was arbitrary and capricious based on how Defendant Sola felt about Plaintiff's writings. Defendant Sola admitted that he punished Plaintiff CCF based on what the former "felt" about Plaintiff's writings.

65)  Even, in the Defendant Travis Sola's cyber-classroom the First Amendment has some application- Plaintiff had a right to express his emotive and cognitive expressions unless his speech amounted to "obscenity," "pervasive harassment," "fighting words," or otherwise incited a violent reaction. It would be impossible for the average adult to understand and possibly meet Defendant Sola's overly broad terms of "appropriate" and "respectful" in constructing written critical thinking opinions while playing "Devil's Advocate". The fact that Sola requested prior review of adult students' opinions is censorship and suggests that some would be less likely to express his or her true opinions to avoid such review. Defendant Sola's protected- speech chilling language evidences Defendant Sola's stance that he was the sole arbiter as to which opinions expressed in his classroom by other adults were acceptable, and which were not. Students were writing their opinions about highly subjective topics, not answering true or false questions. Defendant Sola's Parkland College students were not entitled to "reserve opinions" on matters as guaranteed by Parkland's explicit rules under freedom of expression and inquiry. Controlling the thoughts and opinions of adult college and university students, when assignments require students to devise their own opinions results is totalitarian "THOUGHT CONTROL, and serves NO legitimate educational purpose or pedagogical concern for purely subjective topics of discussion. It also creates an environment ripe for arbitrary and capricious punishment based on expressed opinions. Defendant Sola and Parkland College cannot demonstrate that their prior restraint on the speech and expressiveness of adult college students was based on the knowledge of preventing negative acts which were sure to result from impolite, insensitive or assumed disrespectful speech.

66)  The U.S. Department of Education's Office of Civil Rights provided guidance on the issue of the First

Amendment and possible conflicts with Title IX statutes.

> "XI. First Amendment
> In cases of alleged harassment, the protections of the First Amendment must be considered if issues of
> speech or expression are involved. [112] Free speech rights apply in the classroom (e.g., classroom
> lectures and discussions) [113] . ... In addition, First Amendment rights apply to the speech of
> students and teachers. [116]
>
> Title IX is intended to protect students from ... discrimination, not to regulate the content of speech.
> OCR recognizes that the offensiveness of a particular expression as perceived by some students,
> standing alone, is not a legally sufficient basis to establish a ... hostile environment under Title IX.
> [117]" (*Revised Sexual Harassment Guidance: Harassment of Students By School Employees,
> Other Students, Or Third Parties  Title IX* January 2001  U.S. Department of Education:
> Office for Civil Rights)

67)  Defendant Travis Sola and in part, Defendant Myers are responsible for initiating the violations of

Plaintiff's constitutional rights. In punishing the Plaintiff based solely on the fact that Plaintiff's written

opinions and expressions were considered "offensive," not polite" in tone, "not respectful," and

"inappropriate," Defendant Sola violated well-established law. Plaintiff's speech, as an adult, wherein he

was invited to share HIS opinions, is protected under the First Amendment of the *United States

Constitution*. Defendant Sola's punishment of the Plaintiff began the sustained and continuing violation

of Plaintiff's constitutional rights. As long as the punishment remains and negative documentation

remains associated with Plaintiff CCF's academic records at Parkland, the unlawful constitutional

injuries persist. Plaintiff CCF's employment or future educational prospects could be tainted by records

of his disciplinary punishment and the harassment claim that was filed against him and acted upon by

Defendant Marietta Turner, AFTER Plaintiff CCF initiated a grievance against Defendant Sola.

68)  Although the Plaintiff's intent was not to offend, harass, intimidate or, to be insensitive, the First

Amendment undeniably allows for offensive and insensitive feelings to result when a citizen exercises

his First Amendment rights. No Parkland College official ever questioned Plaintiff about the INTENT of

his writings. Had Plaintiff CCF's opinions met the instructor's overly broad and arbitrarily determined

definitions of "appropriate," "polite," "humble," "respectful," or "civil," this matter would not be before

this court. University and college administrators may restrict First Amendment rights under very limited

situations, as defined by the federal courts, and specifically the United States Supreme Court. These

restrictions mostly center upon "fighting words," whose precedent was MANDATED by the United

States Supreme Court in *Chaplinsky v. New Hampshire, 315 U.S. 568, 572–73 (1942)*.

69)     Defendant Sola wrote, in response to Plaintiff CCF's formal grievance, "As a psychology instructor at Parkland College, I do not believe it is appropriate for me to" address the First Amendment. Notwithstanding the fact that Mr. Sola is not an attorney, he is charged with the teaching and fair evaluation of adult American citizens. Defendant Sola's totalitarian and arbitrary approach and attitude fertilized the violation of Plaintiff's rights. Anecdotal evidence dated back to 2003 demonstrates that some students at a different college wrote of Defendant Sola's arbitrary, capricious and totalitarian manners: "*Close-minded* on most topics," "Thinks he knows everything and *won't let discussions take place*," "He *belittles you* when you ask a question in class," and "He treats us like we are stupid. " Defendant Sola's disregard for the First Amendment may not be new. At least six years ago, students at a different college had sentiments similar to those now realized by instant Plaintiff.

70)     *Tinker* dealt with high school-aged students. Certainly, adult college students are, at a minimum, entitled to this same precedent established protection as was thirteen year old Mary Beth Tinker. The United States Supreme Court wrote in its *Tinker* decision:

> "It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate. … The District Court concluded that the action of the school authorities was reasonable because it was based upon their fear of a disturbance from the wearing of the armbands. But, in our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." (*Tinker v. Des Moines Ind. Comm. School Dist.*, 393 U.S. 503 ,(1969))

71)     As to Plaintiff's First Amendment Claim, Plaintiff had established freedom of speech and expression rights at Parkland College. The written speech and expression conveyed a particularized message. It is clear that others understood Plaintiff's message, and they engaged in discussion of his message. Parkland College acted as agents of local government, who are not entitled to Eleventh Amendment immunity, to prohibit and punish Plaintiff's speech and expression. Plaintiff's speech and expressions were academically innocuous and germane to the academic discourse. Plaintiff's written speech and expressions have never been defined as lewd, vulgar, obscene, profane, violent, violent-provoking, disruptive, threatening, defamatory or any other category which would allow for its prohibition. Plaintiff's particularized message did NOT breach the peace or cause a disruption in the internet classroom. Plaintiff's written speech and expressions did not incite imminent violence or advocate the immediate or future breaking of any laws. The other adult students were not forced to read Plaintiff's words; they did so on a purely voluntary basis. In addition, Defendants utilized vague and broad rules to chill the free speech of students and as the justification for punishment of the Plaintiff. Plaintiff's First

Amendment rights were violated when Defendant Sola punished Plaintiff's speech because Defendant Sola and Defendant Myers arbitrarily determined that it was "inappropriate," "disrespectful," "offensive" and not in a "polite" framework. The First Amendment does NOT allow for the prohibition of speech based on the CONTENT or agreeableness of the message.

## SECOND CLAIM

## Violation of Fourteenth Amendment Rights to Procedural & Substantive Due Process

72)    Plaintiff CCF restates and incorporates the above-stated facts herein.

73)    Relative to Plaintiff's *42 U.S.C. §1983* action, Plaintiff CCF was punished by the Defendants acting in their official capacities as "agents of the state," through local district government, under laws and rules promulgated under such authority. The evidence will show that the actions of the Defendants acting under such laws and rules deprived the Plaintiff of his First Amendment Rights and his rights to Procedural Due Process and Substantive Due Process.

> "Article 3 of the Public Community College Act (110 ILCS 805/3-1 et seq. (West 2004) sets forth the powers and duties of the board of trustees of a community college district.... Moreover, the board is statutorily authorized to enter into contracts... and to sue and be sued. The board of each community college district is designated a body politic and corporate (110 ILCS 805/3-11 et seq. (West 2004) Community college district boards possess the key indica of special districts as set out in Danaher. ... They may sue and be sued independently.... Community College districts are "special districts" under the Illinois Constitution of 1970. As such, they are considered 'units of local government.'" (Letter from Illinois Attorney General-Lisa Madigan to president, Illinois Community College Board, File # 05-009, 5 October 2005)

74)    The grievance process was NOT a part of Plaintiff's disciplinary process. Plaintiff's discipline process and the grievance process, while related were two distinct activities. Plaintiff was given zero procedural or substantive due process by Defendant Sola or administrators at Parkland College, prior to punishment. The Student grievance committee hearing was a distinct process for Plaintiff to complain of Defendant Sola's improper actions. The initial process of finding that Plaintiff CCF violated a policy and the related discipline and punishment was entitled to some form of minimal due process in that Plaintiff had a clear property right in his academic evaluations and the caliber associated with his academic records. Defendant Sola reached an arbitrary decision that Plaintiff CCF's speech was "inappropriate" and "not polite." Defendant Sola decided to punish Plaintiff, discussed that punishment with Defendant Myers, and then Defendant Sola informed Plaintiff CCF of the punishment, and expected that that would be the end of the story. The story continues. The procedures afforded the punishment of Plaintiff for a matter

protected by the *United States Constitution* deserves at least the appearance of procedural and substantive propriety.

75)   Further, after 31-WFS filed her harassment complaint against the Plaintiff, Defendant Marietta Turner telephoned the Plaintiff. Defendant Turner was not interested in fact-finding or hearing Plaintiff's side of the story. Evidence will show that Defendant Turner's quest was to gain an apology from the Plaintiff. Defendant Turner's actions short-circuited Plaintiff CCF's grievance rights to procedural and substantive due process. Plaintiff was now accused of harassment and discrimination by 31-WFS, summarily adjudged guilty by Defendant Marietta Turner, and threatened with apologizing or facing further sanction. Plaintiff declined to apologize. Plaintiff CCF had rights to procedural due process, substantive due process and his rights to freedom of speech and expression. Defendant Turner, as a state actor violated those rights and Defendant suffered from her actions. The U.S. Department of Education's Office of Civil Rights indicates that the accused has rights under *Title IX* harassment complaints. The Defendants either did not know that they should, or did not care to allow Plaintiff Due Process once he was the named subject of a formal harassment complaint alleging harassment on the bases of gender and disability and for creating a hostile learning environment. The Plaintiff had rights to procedural due process and substantive due process as a result of such complaint. Defendant Turner acted unlawfully to usurp those rights.

76)   The committee behaved in an unethical manner. The committee manufactured negative evidence against the Plaintiff. The committee was dishonest in writing that Plaintiff CCF had admitted wrong-doing in relation to the punished act. The committee disregarded and misinterpreted Parkland's policies and procedures. The bias and impartiality of the student grievance hearing committee members who spoke at the hearing was obvious. It was not an impartial hearing where fact-finders reasonably tried to obtain truth. One member-Defendant Ragsdale told Plaintiff that they had to rely on Defendant Sola's "professional judgment," as the Plaintiff was presenting his case and responding to questions. Her comments made the purpose of the hearing moot. Evidence will show that any member, including the chairperson-Defendant Krall, who spoke, simply derided Plaintiff CCF on how offensive, troubling or improper the Plaintiff's words were. These derisions were not in the form of fact-finding, but the obvious leveling of those members' opinions about the Plaintiff's writings. The comments demonstrated to Plaintiff that the hearing's findings were a foregone conclusion. Plaintiff grew red in the face because the "educational hearing" was a mockery of justice.

77)   Defendant Bryan Krall served as the Chairperson for Parkland's Student Grievance Committee and was instrumental in sustaining the Defendants unlawful actions, and he compounded the violations. Defendant Krall failed in his duties, as chairperson to adhere to the spirit and essence of procedural due process and substantive due process. Defendant Krall claimed that Parkland's College Policies and Procedures Manual was somewhat unclear about specifics, yet for each ambiguous area, Krall found in disfavor of the Plaintiff CCF. During the hearing Defendant Krall also did his part to ensure a panel of bias and impartiality by stating that one of Plaintiff's writing's raised a "red flag," and that it would have been irresponsible of Defendant Sola not to address such.

78)   The Plaintiff was not very knowledgeable about the relative mechanics of the First Amendment, so he utilized an advocate to assist him. Defendant Krall initially stated that in his mind, the role of advocate was an active role. Krall later reversed that decision, and muted Plaintiff's advocate.  Plaintiff's advocate prepared the Plaintiff's student grievance presentation based on Defendant Krall's statement that the advocate was an active role. The advocate performed the very definition of advocate, and guided the Plaintiff through the presentation. As committee members Defendant Ragsdale and another instructor Matt Hurt increasingly espoused oppositional styles towards the Plaintiff, Plaintiff's advocate became less "reticent." The stringent requirements placed only upon the Plaintiff by Defendant Krall and the faculty members of the Student Grievance committee, given the ambiguous rules listed for the student grievance hearing, prevented Plaintiff CCF's pursuit for ANY sense of fairness or justice. The Plaintiff repeated his objections about not being able to question the instructor, despite posing that question three weeks earlier, and then the Plaintiff departed the proceeding because the process was unfair and not conducive to the pursuit of what was fair, just and proper. The repeated and blatant displays of bias and statements about Plaintiff's offensive writing demonstrated that the committee had already made a decision. The hearing was repeatedly called an "educational hearing" designed as a "learning tool." The hearing was grossly unfair- procedurally and not suitable for objectivity, and the findings of the hearing did not address the Plaintiff's substantive issues presented on the "Charging Guideline Sheet," which Defendant Krall had failed to deliver to the committee until the middle of the hearing, and then ONLY at the insistence of Plaintiff's advocate. The "Charging Guideline Sheet" was required to be delivered to the committee prior to the hearing, according to Parkland's policies and procedures. Any learning or education that was to occur at that hearing was replaced by attempts to "educationally" intimidate the

Plaintiff and subjugate his rights with the opinions and personal feelings of the vociferous faculty members (Ragsdale, Hurt, and Krall) on the committee.

79)   Defendant Bryan Krall advised Plaintiff CCF that Plaintiff could not argue that Plaintiff CCF's First Amendment right was violated, during the student grievance hearing, because the First Amendment was not specifically listed in Parkland College's *Student Procedures and Policies Manual, Fall 2008*. Page forty-five(45) of the manual reads:

> "Exercise of rights of citizenship
> Parkland students are both citizens and members of the academic community. As citizens, students enjoy the same freedom of speech, peaceful assembly, and right of petition that other citizens enjoy, and as members of the academic community, they are subject to the obligations which accrue to them by virtue of this membership. Institutional powers are not employed to inhibit such intellectual and personal development of students as is often promoted by their exercise of the rights of citizenship both on and off campus."

80)   Although this is listed in a section entitled "SECTION V — OFFCAMPUS FREEDOM OF STUDENTS" on page 45 of the manual, the paragraph explicitly covers students exercising their rights of American "citizenship both on and off campus." More importantly, the manual indicates that faculty and staff are NOT to inhibit intellectual and personal development. Defendant Sola's restrictions of protected speech stifle independent personal and cognitive opinion-construction, and thus inhibit "intellectual and personal development." Defendant Krall inhibited Plaintiff's "exercise of rights of citizenship" under Parkland's policies.

81)   The Policies and Procedures manual did not indicate that the charged party had to be called specifically, as a witness, for him to be asked questions. It was clear that the charged party would be present at the hearing. The manual only mentions that the charging party could opt to not call the charged party as a witness; The Plaintiff did NOT opt not to call the charged party as a witness. Based on the chairperson-Defendant Krall's written words, the Plaintiff understood that the charged party (Defendant Sola) would be present at the hearing, and that the Plaintiff could question him. Defendant Krall knew three weeks in advance through writing that Plaintiff intended to question the instructor. Defendant Krall indicated that instructor would be asked to answer Plaintiff's reasonable questions, or that the committee could take that into consideration. The Plaintiff specifically asked if the "instructor would be "REQUIRED" to answer questions related to the incident." The word "required" was CAPITALIZED for emphasis in the original question to Defendant Krall. At the hearing, Defendant Krall first indicated that Plaintiff could question the instructor, but the instructor objected due to not receiving notice that he

would be questioned by the Plaintiff. But, Defendant Krall had failed to issue the "Charging Guidelines Sheet," to anyone. Nearly an hour into the hearing on 2-23-09, and only after insistence from the Plaintiff's advocate that the document was sent to Defendant Krall, at least ten school days prior. Krall finally retrieved the emailed document, dated 2-9-09.  So, at that point advance notice would have been moot because Krall had failed to deliver the document listing any witnesses. Defendant Krall reversed his decision to allow Plaintiff to question Sola, and then denied Plaintiff's request to postpone the hearing, so that Defendant Sola would have adequate notice that Plaintiff would be questioning him. Only through questioning Sola about specifics, could Plaintiff demonstrate Sola's arbitrary and capricious actions to the committee. Defendant Sola had the knowledge required to answer Plaintiff's questions, and Sola knew that he was attending a hearing where he was the accused, and that questions would be asked about his actions.

82)   The committee questioned Defendant Sola. Plaintiff would NOT have been able to question Defendant Sola at anytime during the hearing. Since Krall had forgotten to issue Plaintiff CCF's "Charging Guidelines Sheet," that listed Defendant Amy Myers as a witness, Defendant Myers had about 45 minutes LESS notice than Defendant Sola, that questions would be asked of her, yet she began answering questions. Defendant Krall allowed Plaintiff to ask Myers questions intended for Defendant Sola. So, Plaintiff CCF began asking Defendant Myers questions, and Myers asked the Plaintiff if Plaintiff wanted Myers to ask Defendant Sola for the answers. The process ineffective, reasonably absurd and appeared to visibly frustrate everyone present during the hearing. The inability to question Defendant Sola about his actions severely hampered Plaintiff's opportunity to present his case.

83)   During the hearing, Defendant Krall offered the committee and the charged party two separate opportunities to postpone the hearing due to Defendant Krall's procedural mistakes. At both times, the Plaintiff requested postponements, but they were denied by Defendant Krall. If the committee and Defendant Sola were entitled to opportunities for re-scheduling the hearing due to procedural missteps by Defendant Krall, then it was grossly inappropriate and unjust to deny the charging party (Plaintiff CCF) equal opportunities to do so. The Plaintiff, at that point had had enough of the bias, berating and procedurally flawed process. He read a statement reiterating his concerns and issues, and then he and his advocate departed the hearing in a civil manner. After Plaintiff departed, Defendant Sola offered brief testimony reaffirming how Plaintiff CCF's work was "offensive" and "not polite" in tone. The committee questioned Sola in a manner suggestive of agreement with Sola's decisions.

84)    Perhaps, Defendant Krall's most egregious act was to create or allow to be created false negative evidence against the Plaintiff, which played a part in the committee's decision-making. The most questionable, and perhaps COMPLETELY IRRESPONSIBLE action allowed by Defendant Bryan Krall, the chair of the Student Grievance Committee, and the Committee members is listed in the written report, and COMPLETELY contradicts testimony presented by the instructor, Travis Sola. In the summary report, Mr. Krall wrote:

> "There is also evidence that may suggest that some posts had been edited by [Plaintiff CCF] after receiving contact from Travis. For example, the original post made by [Plaintiff CCF] was dated 11/05. Travis sent [Plaintiff CCF] an email regarding the postings on 11/06. An edit to the original post was made by [Plaintiff CCF] and dated 11/07. Although the committee is not accusing the student of unethical behavior regarding the edits made on the original posts, it may call into question some of the evidence presented by the student."

85)    Semantics aside, the committee felt that there was something questionable about Plaintiff's edits, and thus gave negative consideration to Plaintiff's testimony and evidence. It's difficult to un-ring a rung bell. First, the edited post was not the post that resulted in Plaintiff CCF's punishment. More importantly, Defendant Sola clearly explained during the hearing that the Plaintiff did NOT remove anything from the edited posts, and that he (Plaintiff CCF) added content that Defendant Sola had requested. Sola has NEVER, to Plaintiff's knowledge, suggested ANYTHING unethical about Plaintiff's edits or course work. Edits to correct spelling and grammar were a common practice among students in this course, and other online courses at Parkland College. There was NOTHING unethical, spooky or suspicious about Plaintiff's act. To even imply any unethical behavior by the Plaintiff, given Sola's unambiguous testimony about that fact, and then to question ANY of the evidence presented by the Plaintiff based on a falsely created issue is unethical and improper. It was a significant action that further jeopardized Plaintiff CCF's right to substantive due process. The Plaintiff did nothing wrong in following the instructor's mandate to add content to the subject posts. Why then did the committee manufacture this issue, as a method of further discrediting the Plaintiff?  They had already chastised Plaintiff about his "offensive" written speech. Defendant Krall permitted it, Defendant Ramage supported it and approved of it in writing, the Defendant Board of Trustees, through silence, affirmed approval of Defendant Krall's manufacture of evidence against the Plaintiff.

86)    Further, Krall wrote that the Plaintiff had admitted to wrong-doing in relation to the punished post, when in fact- it the evidence was clear that Plaintiff had made no such statement regarding the *punished* written speech.

87)    Another diminishment of Plaintiff's right to substantive due process related o disciplinary action against students is that nowhere in the report does it mention or address the ACTUAL PUNITIVE EVENT from 12-2-08 related to Plaintiff's discussion board post dated 11-29-08. Plaintiff's "Charge Guidelines" and Plaintiff's "Formal Written Grievance" clearly detailed the Plaintiff's requests.  The committee's report completely failed to address ANY of Plaintiff's requests for reconciliation listed within the Plaintiff's "Student Grievance Charge Guidelines." Neither Defendant Krall, nor the committee, nor Defendant Ramage or Defendant Board of Trustees ensured procedural or substantive due process. Defendant Ramage and the Defendant-Parkland College Board of Trustees affirmed the lack of procedural and substantive due process through inaction, silence, and by Ramage's friendly short letter affirmed that nothing improper happened, as related to Plaintiff CCF's free speech punishment. Defendant Ramage and the Defendant Board of Trustees affirmed the violation of Plaintiff's Due Process Rights, when Ramage wrote ".… I have reviewed your appeal, the process employed by the grievance committee, and their findings. I find no cause to reverse the decisions of the committee."

88)    Plaintiff's Due Process property interest were established by Parkland College's existing rules for DISCIPLINARY MATTERS, and he was entitled to be disciplined according by the rules that were established by Parkland College. It is clear that Plaintiff received "Disciplinary Action" with no regards for any process, and no legitimate or meaningful post-disciplinary action. One of the first responses as Plaintiff began complaining, was that Plaintiff was going to waste a lot of people's time. How can meaningful due process occur within such a dismissive or uninformed culture? It becomes an arbitrary process at Parkland, as to when and how due process is enacted, or as to when and how Parkland College officials will follow their own lawful policies and procedures. A reasonable college administrator would have known that a student who was accused of violating the student conduct code on numerous occasions was entitled to minimal due process prior to disciplinary action, which resulted in constitutional deprivations. Ironically, the student grievance faculty committee members were adamant in following the rules espoused in the student manual during the student grievance hearing. It is then reasonable that the rules should have been followed as they related to Plaintiff's disciplinary action. To be clear, Defendant Sola's action was not an academic decision. It was a personal arbitrary and capricious act of disciplinary punishment for "offensive," non-polite, and non-respectful written opinions.

89)    If the Defendants had followed their LAWFUL policies and procedures, and granted the Plaintiff the Due Process that he was entitled, according to Parkland's LAWFUL rules, no unusual fiscal or administrative burdens would have arisen. If Plaintiff was accused of violating college policy; Plaintiff's Due Process rights attached and should have been afforded him. Parkland College had a duty to ensure that its faculty and staff were knowledgeable of the rules, and that they followed such rules. The actions of the officials were arbitrary, and appear wholly based on the distaste for Plaintiff's written speech and expressiveness. The erroneous deprivation of Plaintiff's continued good academic reputation outweighs the summary email post-facto method of "disciplinary action." Plaintiff did not receive an impartial tribunal. Plaintiff did not receive prior notice of proposed punishment and the reasons for it. Plaintiff holds that Defendant Sola's summary discipline of Plaintiff is separate and distinct from the grievance process to complain of violation of Parkland's policies. According to Parkland College's policies and procedures, Defendant Sola should have referred the matter to the Dean of Students, and a Disciplinary Hearing would have resulted- if one was merited. Plaintiff was not given an opportunity to object to the punishment. Plaintiff was not allowed to present evidence or call witnesses. Plaintiff was advised of the opposing evidence. Plaintiff did not have a right to cross-examine adverse witnesses. Defendant Sola capriciously punished Plaintiff based on Defendant Sola's arbitrary personal feelings regarding Plaintiff's written opinionated speech and expression, not on legitimate evidence. The Defendants violated Plaintiff's rights to Due Process under the Fourteenth Amendment of the *United States Constitution.*

90)    As to Plaintiff's Due Process Claim, under *42 U.S.C. §1983*, Plaintiff asserts that Defendants acted willfully, intentionally, wantonly and possibly malicious manners in executing  or failing to execute their official capacities as state actors, under laws and rules  promulgated under such authority and committed several acts which deprived the Plaintiff of his First and Fourteenth Amendment rights. Plaintiff had a property interest in his education as evidenced by his rendering funds to Parkland College. Plaintiff had and has an ongoing property interest in the caliber of his academic reputation. Plaintiff has a property interest in the reputation associated with his name. First, Parkland College violated Plaintiff's First Amendment rights by punishing him without any due process, thereby violating Plaintiff's rights to any Procedural or Substantive Due Process. Then, as Plaintiff utilized a grievance process to complain about the violation of his rights, his rights to Procedural and Substantive Due Process were violated in that process too. The actions of the Defendants were arbitrary, capricious, unreasonable, and in violation of the Defendants' own policies and procedures. Plaintiff's private interest that was affected by the

Defendants' actions was his academic reputation. Given the competitiveness of employment and graduate school admissions, the malicious behaviors of the Defendants are poised to create harm to Plaintiff's academic and employment opportunities.

## THIRD CLAIM

### Violations of the Substantial OverBreadth and Overly Vague Doctrines

91)    Plaintiff CCF restates and incorporates the above-stated facts herein.

92)    Defendant Sola's Psychology 203 course syllabus and Parkland College's anti-harassment policy are UNCONSTITUTIONAL based upon the DOCTRINES of OVERBREADTH and VAGUENESS. Both sources of their rules and regulations, which proscribe speech have a chilling effect upon protected speech of Plaintiff and other students. They are both facially overly broad and facially vague. Defendant Sola's course syllabus and Parkland College's anti-harassment policy both REACH TOO FAR INTO THE ARENAS OF PROTECTED SPEECH. And, the language contained within both are OVERLY VAGUE, and could be interpreted by average adults to mean different things, based upon those adults gender, race, upbringing, religious affiliation, educational mindset, political affiliation, etc…. Evidence WILL demonstrate that the Plaintiff was punished based on subjective interpretations of his opinion and arbitrarily determined POSSIBLE intent(s) of his speech. Parkland College administrators and Defendant Sola used Parkland College's anti-harassment policy to support Sola's decision to punish Plaintiff CCF's protected speech. The relevant section of Defendant Sola's Psychology 203 course syllabus reads:

> "…. Postings should add to the discussion by critically reflecting on the topic being discussed. Simply posting "I agree" or rewording someone else's posting or response will NOT receive credit. ... All postings should be respectful of others and strive to follow critical thinking guidelines (please review the Critical Thinking Guidelines). *Inappropriate postings (for example: personal attacks, prejudiced language, incoherent ramblings, proselytizing, etc.) will not be tolerated* and may result in the removal of the posting, a loss of points, or further disciplinary measures. If you are not sure about the appropriateness of a posting, please check with me before you post it."

93)    It would be nearly impossible for a classroom of diverse adults to continuously reach uniform definitions as to what dictates "APPROPRIATE," "POLITE," "HUMBLE," or "RESPECTFUL" speech and expressions. Sola's students could not support their opinions with their religious beliefs, for fear or "proselytizing." Furthermore, based on differing personal characteristics, cultural norms and group affiliations, those terms could mean very different things to different people. The broadness and

vagueness of Defendant Sola's syllabus and Parkland College's anti-harassment policy both effectively prohibit and chill a student's likelihood of conveying particularized messages of his sincere opinions about an issue through cognitive and emotive aspects of expressions and speech. The critical thinking discussion of opinions of adults regarding social issues require tolerance for a wide variety of opinions, as they are SOMETIMES apt to be assertive (non-humble), unfavorable (inappropriate or impolite) and in playing "Devil's Advocate"-argumentative and divergent (not respectful). The actions of the Defendants contravenes the First Amendment, decisions from the United States Supreme Court, and very specific and recent explicit guidance from the United States Department of Education- Office of Civil Rights. In this matter, Plaintiff CCF's clearly-established First Amendment Rights must be rescued from Defendant Sola's overly broad arbitrary personal preferences disguised as academic pedagogical standards. Defendant Sola's justification:

> "I acted with legitimate and appropriate authority for setting academic standards and assessing student performance on the basis of those standards alone. Furthermore, the academic standards of my Psychology 203-941 course are consistent not only with the *Parkland College Student Policies and Procedures Manual*, but also the mission and purposes, general education goals, and statement of core values for Parkland College."

94)   Defendant Sola latched his actions to the overly broad and overly vague language of the *Parkland College Student Policies and Procedures Manual.* Parkland's overly broad policies support Defendant Sola's actions. Yet, precedents of previous Court rulings on the First Amendment in schoolhouse settings, and if the First Amendment is construed in a liberal manner, as applied to the speech of college and university students, indicates that the First Amendment of the *United States Constitution* must trump the overly broad restrictions of *Parkland College Student Policies and Procedures Manual* and Defendant Sola's syllabus. If courts have disallowed university administrators from prohibiting and restricting free speech with such wide and encompassing speech codes, it seems very unlikely, that professors or instructors of those institutions are allowed to deface the First Amendment "willy-nilly." The overly broad and overly vague section of Parkland College's anti-harassment speech code, which supports Plaintiff's punishment is found on pages twenty-one (21) and twenty-nine (29) of the *Parkland College Student Policies and Procedures Manual, Fall 2008.*

> "HARASSING/DISCRIMINATING BEHAVIOR
>
> Harassment or discrimination is any conduct that:

• degrades or shows hostility toward an individual because of race, color, sex or sexual orientation, religion, national origin, age, disability, veteran or marital status, or retaliation for complaining about harassment or discrimination;
• creates an intimidating, hostile, or offensive environment through written, graphic, or verbal communications including comments, jokes, slurs, or negative stereotyping, or interferes with an individual's performance."

"E-MAIL ACCESS AND USE
…. All e-mail communications are the property of the College. Students have no personal privacy rights in any materials, created, received, or sent using e-mail. … Students using e-mail for internal or external communication must follow the standards applicable to other professional education communications. As with other professional education communications, e-mail containing offensive and off-color language, vulgarities, obscenities, derogatory remarks or any language that could be construed as harassment or discrimination on the basis of age, race, religion, disability, national origin, or gender will not be tolerated. … E-mail may be monitored by the College at any time and without notice to prevent its abuse or misuses.

…. Any violation of the policy may constitute grounds for disciplinary action which can include elimination circumstances, student expulsion."

95)   Parkland's above listed policy is so OVERLY BROAD and OVERLY VAGUE that it reaches FAR TOO DEEP into the abyss of protected speech. There should be no legal exceptions found to lawfully permit the continued existence of some of the speech and expression-prohibiting language in Parkland's student manual. Can Parkland adequately prohibit ALL "offensive" communications across its internet system (to include online courses and "private" emails) because Parkland, a public college claims to own their internet service? "What does Parkland mean by "off-color language? How would a "derogatory remark" be defined by Parkland College? How would Parkland sufficiently clarify "ANY language that could be construed as harassment or discrimination…?" Parkland College's speech code is facially broad and facially vague. Parkland College's anti-harassment speech code, as written, will cover speech that is protected. Comparison of Parkland's speech proscriptions other university codes that were ruled unconstitutional demonstrates that Parkland's code is more than likely to FREEZE the speech and expressiveness of its students.

96)   A 7th Circuit District Court ruled the University of Wisconsin's broad and vague speech code unconstitutional due to overbreadth read in part, and it was as broad and vague as Parkland's, and it did not punish classroom discussions:

"….1. Demean the race, sex, religion, color, creed, disability, sexual orientation, national origin, ancestry or age of the individual or individuals; and
2. Create an intimidating, hostile or demeaning environment for education, university-related work, or other university authorized activity." (*UWM Post v. Board of Regents of University of Wisconsin*, 774 F. Supp. 1163 (E.D. Wis. 1991))

97)	Similarly, the Federal District Court for Eastern Michigan, Southern Division in *Doe v. University of Michigan* wrote, in the course of invalidating Michigan's anti-harassment speech code:

> "… The Policy prohibited individuals, under the penalty of sanctions, from "stigmatizing or victimizing" individuals or groups on the basis of race, ethnicity, religion, sex, sexual orientation, creed, national origin, ancestry, age, marital status, handicap or Vietnam-era veteran status. However laudable or appropriate an effort this may have been, the Court found that the Policy swept within its scope a significant amount of "verbal conduct" or "verbal behavior" which is unquestionably protected speech under the First Amendment." (*Doe v. University of Michigan*, No. 89-71683, 721 F. Supp. 852, (E.D. Mich 1989))

98) The U.S. 3rd Circuit Court of Appeals addressed a highly similar speech code when it affirmed a District Court's summary order for Plaintiff's pre-emptive injunctive relief against Temple University's then facially unconstitutional speech code. That Plaintiff had not suffered any disciplinary action.

> "'all forms of sexual harassment are prohibited, including . . . expressive, visual, or physical conduct of a sexual or gender-motivated nature, when . . . (c) such conduct has the purpose or effect of unreasonably interfering with an individual's work, educational performance, or status; or (d) such conduct has the purpose or effect of creating an intimidating, hostile, or offensive environment.'" (*DeJohn v. Temple Univ.*, 537 F.3d 301 (3d Cir. 2008))

99) Parkland College's statement that "….*Offensive and off-color language, ... derogatory remarks or any language* that could be construed as harassment or discrimination on the basis of age, race, religion, disability, national origin, or gender will not be tolerated" chills the likelihood that other students will engage in expressing or writing novel ideas or opinions that are more than likely protected by the First Amendment. The terms "offensive, and off-color language, derogatory remarks or any language that could be construed as harassment or discrimination..." cover almost anything uttered or written, because it is feasible for others to always arbitrarily find something offensive, derogatory or off-color about another's speech or expressions. And, the fact that anything that can be construed in a negative manner is punishable too definitely unconstitutionally inhibits Plaintiff protected speech and that of other Parkland students.

100)	Parkland's speech code goes much further than the mentioned universities whose speech codes were ruled unconstitutional due to overbreadth and vagueness.  Also, the policy could be used to punish a religious or political group organizer, from duly and properly registered student organizations, who discuss through Parkland's electronic conduits- details and plans of visits of controversial guest speakers, for topics of controversy such as race issues, sexual orientation, anti-religion, anti-gay marriage, or death

penalty racial disparities would fall under the punitive umbrella of Parkland's expansive blanket of proscribed speech and expression. Parkland College's anti-harassment speech code goes too far.

101)    Although jurisprudence typically gives great deference to educators, nowhere does the law allow for such broad and vague speech and expression restrictions and supposed pedagogical policies to establish a basis for DISCIPLINARY ACTION of public college and university students who express unpopular or possibly insensitive opinions that are germane to classroom discussion. High school students are afforded more "freedom of expression" in the classroom by federal courts, through *Tinker* than that allowed by Defendant Sola's syllabus and *Parkland College's Policies and Procedures Manual* anti-harassment policy. Parkland College's officials are allowed to tailor very narrow categories of speech restrictions. Instead, Parkland College and Defendant Sola did the opposite.

102)    Plaintiff does not intend to offend this court or anyone else, the following stated facts are meant to merely example language that could be punished by Parkland as "offensive and off-color language, vulgarities, obscenities, derogatory remarks or any language that could be construed as harassment or discrimination on the basis of age, race, religion, disability, national origin, or gender...." "Vulgarities" and "obscenities" are the only constitutionally-permissible narrow prohibitions that Parkland College has listed under the policy, which was to control Plaintiff's "behavior" and justified Plaintiff's "disciplinary action." The following eight factual statements could arbitrarily be deemed in violation of Parkland's broad and vague speech code, and then capriciously punished.

1. Violent young Caucasian men, as members of the Ku Klux Klan, terrorized African-Americans in the South during the 1960s.
2. Statistically speaking, per capita, young Black men are more likely to be or have been lawfully-convicted criminals.
3. Illegal immigrants from Mexico are a part of the crime problem in Texas and Southern California.
4. The driving habits of teenagers and those aged 75 to 84 are responsible for higher motor vehicle fatality rates.
5. Pregnant female employees in the same positions as male employees do not work as hard as their male co-workers.
6. Male leaders of nations, as a whole, have been far more destructive in the World, than have female leaders.
7. Homosexuality is still considered somewhat incompatible with service in the United States Armed Forces, so homosexuals in the military are required to keep their homosexual business to themselves.
8. Problems may arise when the terms "nigger," "cracker," "colored", "honky," or "wetback" are used in the academic context, given the historic negativity associated with the words.

103)    Plaintiff CCF assumes that Defendant Sola implied usage of "respect" and "respectful" according to
        Webster's online dictionary third definition of "respect" as: "3 a : high or special regard : esteem b : the
        quality or state of being esteemed  c plural : expressions of respect or deference." (http://www.merriam-
        webster.com/dictionary/respect) The overly vague and overly broad sense of the word "respectful" and
        "appropriate" among adults from varied social, religious, cultural and ethnic backgrounds is immense.
        Even among lawyers, the concept of "respect" due judges might differ. For instance, the respect granted
        a traffic court judge might differ from that associated with an Illinois criminal court judge or a tenured
        federal court judge. Then, consider the level of "respect" imparted upon a state's Supreme Court justices
        and how it might fail in comparison to the level of respect accorded Justices of the United States
        Supreme Court. Another judicious comparison of the varied interpretations and tolerance of "respect"
        would be the language that a suburban police officer would deem respectful during a traffic stop
        involving a teenager, and that which a state prison correctional officer might consider respectful from an
        angry adult inmate. One final example centers around the recent lively debate of Congressman Joe
        Wilson's spontaneous outburst- "You lie" directed to U.S. President, Barack Obama during the
        President's address to Congress. Some consider Mr. Wilson's action disrespectful of the Office of the
        President, while others praise Wilson as standing up for his principles. "Respectful" encompasses broad
        understandings, and it is not conducive to a strict subjective or objective interpretation as the Defendants
        contend. Despite such, the First Amendment prohibits government agents from banning speech on the
        basis of whether the message is "respectful" or "disrespectful," as prohibitions, with very few exceptions
        must be CONTENT-NEUTRAL.

104)    Defendant Sola only tolerates speech, opinions and expressions that are "respectful" and "humble."
        The act of being "humble" can detract from the assertiveness required in forming critical arguments. If
        Defendant Sola's intolerable arbitrary and capricious pedagogical concerns were to stand, his students
        could ONLY express polite respectful opinions in deferential, insignificant, non-proud, and non-assertive
        manners with feelings of low-worth. If Defendant Sola's practices would be damaging and unlawful to
        the high school environment under the *Tinker* ruling, then certainly Defendant Sola's ideals on learning at
        the college and university level are completely misplaced, counterproductive to the independent growth
        of young adults, poisonous to the robust exchange of novel and thought-provoking ideas, and clearly
        chills the exchange of speech and expression guaranteed by Parkland College and the First Amendment.
        Defendant Sola's colleague, and grievance process advocate,  psychology instructor- Terry Adcock who

teaches the same psychology course with the same assignments did not have the overly vague and overly broad prohibitions on student expressiveness for critical thinking discussion assignments in her syllabus. So, Defendant Sola's academic standards and pedagogical concerns are MERE PERSONAL PREFERENCES competing against college students' right to freedom of speech, and freedom of expression. His speech-prohibitive preferences do not legitimately relate to the teaching of psychology.

105)     Defendant Sola's pedagogical constructs are non-conducive to the academic environment of adult students. This is best demonstrated by the words expressed by the U.S. District Court for New Hampshire in *Silva v. University of New Hampshire, 1994*. Although the case related to a professors "academic freedom," that court did address and consider students. As part of its ruling, in finding that the professor's and university students' freedom of expression override trivial overly subjective pedagogical concerns, the court wrote, in part:

> "...The classroom is peculiarly the `marketplace of ideas'. The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth `out of a multitude of tongues, [rather] than through any kind of authoritative selection'... Scholarship cannot flourish in an atmosphere of suspicion and distrust. Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die...the USNH Sexual Harassment Policy as applied to Silva's classroom speech is not reasonably related to the legitimate pedagogical purpose of providing a congenial academic environment because it employs an impermissibly subjective standard...." (*Silva v. University of New Hampshire, 1994*)

106)     Defendant Sola's syllabus, Parkland College's *Policies and Procedures Manual* anti-harassment policy and punishment of the Plaintiff based on the two are unconstitutional. The Plaintiff was punished for an alleged CONDUCT MATTER based solely on the expression of his opinion, and threatened with "further disciplinary action" by Defendant Sola if he expressed further disagreeable opinions. As the U.S. District Court for Eastern Wisconsin wrote, when it adjudged the University of Wisconsin's "UW Rule" to be "unconstitutionally vague" and "on its face violates the overbreadth doctrine:"

> "...situations where the rule is applied to speech which is intended to inform or convince the listener. However, as stated above, the First Amendment protects speech for its emotive function even if it lacks cognitive value. The construction may also tend to limit the reach of the rule to speech which is unanswerable and constitutes a verbal assault on the person addressed. Nonetheless, as mentioned to above, these considerations do not affect the protected status of speech. Finally, the limiting construction may increase the probability that the rule will be applied where a student's speech tends to cause an immediate breach of the peace. Nevertheless, as stated above, the rule will still cover many situations in which there is little likelihood of violent reaction." (*UWM Post v. Board of Regents of University of Wisconsin*, 774 F. Supp. 1163 (E.D. Wis. 1991))

107)    As to Plaintiff's claim of Overbreadth and Vagueness, Plaintiff was punished based on such vague and broad rules. So, there is more than a mere likelihood that other students' freedom of expression and speech will be inhibited by the vagueness and overly-expansive breadth of Parkland College's anti-harassment speech code and Defendant Sola's course syllabus. Parkland College's anti-harassment speech codes, especially the above-mentioned sections regulate the speech and expression of ALL students regardless of previous conduct. It captures in its wide trap an unfathomable amount of protected speech with phrases such as "derogatory remarks," "offensive," "inappropriate," "any language that can be construed," "respectful" and "off-color language." Parkland College does not provide any examples to demonstrate REASONABLE specificity which language prohibited, and which language is not. Those categories are considered violations and are subject to disciplinary action by Parkland College, and that is why the instant Plaintiff was punished. It is extremely likely that other students have been, and will continue to have their speech inhibited and punished under Parkland's facially vague and broad speech code. Defendant Sola's syllabus mandating "respectful" and "appropriate" language and that "inappropriate postings (for example: personal attacks, prejudiced language, incoherent ramblings, proselytizing, etc.) will not be tolerated" are equally vague and broad and also inhibit the protected free speech of students. Neither Parkland College's speech code, nor Defendant Sola's pedagogical concerns are tailored narrowly or properly enough to coalesce with the First Amendment speech and expression rights of public college or university students. The enunciated prohibitions can easily be arbitrarily used to cover almost ANYTHING uttered or expressed, with which another disagrees and then capricious disciplinary action ensues, as it did for the instant Plaintiff. The Defendants' written policies prohibiting speech and expression create distinct violations of both the *Doctrine of Overbreadth* and its related *Doctrine of Vagueness*. (*Broadrick v Oklahoma*, 1973; *Erznoznik v Jacksonville* , 1975; *Bd. of Airport Commissioners v Jews for Jesus*, 1987; *Virginia v Hicks*, 2003) and (*Coates v Cincinnati*, 1971; *Keyishian v Board of Regents*, 1967)

## FOURTH CLAIM
## <u>Defamation (Libel) of Character</u>

108)    Plaintiff CCF restates and incorporates the above-stated facts herein.

109)   Defendant Bryan Krall, the chair of the Student Grievance Committee, and the Committee members listed negative information about the Plaintiff, in the committee's written report that is COMPLETELY contradicted by testimony presented by the instructor, Defendant Travis Sola. In the summary report, Mr. Krall wrote:

> "There is also evidence that may suggest that some posts had been edited by [Plaintiff CCF] after receiving contact from Travis. For example, the original post made by the [Plaintiff CCF] was dated 11/05. Travis sent [Plaintiff CCF] an email regarding the postings on 11/06. An edit to the original post was made by [Plaintiff CCF] and dated 11/07. Although the committee is not accusing the student of unethical behavior regarding the edits made on the original posts, it may call into question some of the evidence presented by the student."

110)   Semantics aside, the committee felt that there was something questionable about Plaintiff's edits, and thus gave some form of negative consideration to his testimony and evidence. Defendant Sola clearly explained during the hearing, as evidenced by the recording, that the Plaintiff did NOT remove anything from the post, and that he (Plaintiff) added content that Defendant Sola had requested. Sola has NEVER, to Plaintiff's knowledge, suggested ANYTHING unethical about Plaintiff's edits or course work. To even imply any unethical behavior by the Plaintiff, given Sola's unambiguous testimony about that fact, and then to question ANY of the evidence presented by the Plaintiff based on falsely created implications is unethical and improper.

111)   This extra distinct and explicit written characterization paints Plaintiff's course work as having been conducted in an unethical manner, and then publishes that opinion to others. If Defendant Krall, Defendant Ramage, and the Defendant Board of Trustees had simply listened to Defendant Sola's words that Plaintiff only added the material that Defendant Sola required, this issue would not exist. Wherein this very relevant question significantly confused committee members and Defendant Krall, and where Defendants were able  to query Defendant Sola on this important issue or to request copies of Plaintiff's work from the department which maintains Parkland's internet distance learning servers, the Defendants had a duty to settle this simple question prior to reaching a decision. But, again, Plaintiff knew that the committee's decision was a foregone conclusion. Defendant Krall basically wrote that Plaintiff was a dishonest student who had lied to the committee, even though clear evidence from the course instructor demonstrated the opposite.

112)   Defendant Krall published a false and libelous determination about the Plaintiff which was known to be false, based on all of the given evidence and written and oral statements given by his colleague-Defendant Sola. Defendant Krall caused this false and libelous information to be delivered to others,

which resulted in further damage to Plaintiff's reputation. The false information was not a matter of opinion. It was a matter of fact, in which, the sole decision to dismiss Plaintiff's testimony was based. Defendant Krall was not entitled to fabricate and disseminate false and damaging information about Plaintiff to third parties. Defendant Ramage and Defendant Board of Trustees affirmed this defamation either intentionally or negligence in utter disregard for Plaintiff's rights not to be defamed.

113) Defendant Krall then went further to state an untruth that Plaintiff admitted to wrong-doing in relation to the punished act, when it was clear that Plaintiff had not admitted such. Krall wrote: "[Plaintiff CCF] admitted to violating the standards laid out in the syllabus." This is another blatant manufacturing of negative evidence against the Plaintiff. It is a known fact that Plaintiff never admitted to violating the standards laid out in the syllabus. It should have been obvious to Defendant Krall that he was writing an untruth, and that as, a result of such he would bring harm to Plaintiff's reputation once the information was published to other persons. Such did not halt Defendant Krall's behavior.

114) As to Plaintiff's Claim of Defamation by Libel, Defendants knew or should have known based on clear evidence in their possession that they were making false and defamatory statements. To write that one has admitted to wrong-doing for a punished act, to write that one has behaved in an unethical academic matter, or to write that one has violated college policy when it is known not to be factually true is defamatory and damaging to Plaintiff's academic reputation. The defamatory statements were then published to numerous other parties, other than the Plaintiff. The Defendants created defamatory information which was "new" and then transmitted said information. Plaintiff suffered and continues to suffer damage to his academic reputation, and knows that his educational records at Parkland College would harm future academic and employment opportunities. Plaintiff has refrained from attending further classes at Parkland College due to the published damaging report. The Defendant's damaged and deprived Plaintiff's liberty and property interests in the good reputation of his name and the continued high caliber of his academic reputation. Defendants Krall initiated the Defamation of Plaintiff. Defendants did defame the Plaintiff by way of libel.

## FIFTH CLAIM
### Breach of Contract

115) Plaintiff CCF restates and incorporates the above-stated facts herein.

116)    The *Parkland College Policies and Procedures Manual* and the admissions application establish a contract between Parkland College and admitted students. In return for paying tuition and fees, Parkland College students are consumers entitled protections offered by Parkland College and guaranteed protection of their federal and state constitutional rights, in addition to receiving education.

117)    The Plaintiff was ENTITLED to have his academic work evaluated SOLELY on academic performance, not his opinion or beliefs derived from his academic, social, political or religious background. The Plaintiff demonstrated near-excellent competence on each and every objective component of the course. Plaintiff CCF's level of competence is also evidenced by the fact the he pointed out erroneous or highly confusing items on nine different course quizzes or course examinations across the 8-week course, based on facts from the text; Defendant Sola later made score corrections. The Plaintiff was found competent in every component of the course except for the aspect which brings him to court- his opinions. Plaintiff CCF was required to share HIS opinions as part of the course requirements only to have them denigrated and punished by Defendant Sola. Defendant Sola's email comments to Plaintiff must be evaluated to understand that too much mind reading about possible intent and arbitrary personal whims were employed. This oversensitivity and arbitrary and capricious activity motivated the violations of Plaintiff CCF's federal constitutional rights.  Plaintiff CCF expressed his opinions as part of the required course requirements, but was punished in a disciplinary manner ONLY for expressing an unpopular distasteful opinion.   According to *Parkland College Policies and Procedures Manual: Section II- Student Rights and Responsibilities*:

> SECTION II — IN THE CLASSROOM
> The instructor in the classroom and in conference shall encourage free discussion, inquiry, and expression. Student performance is evaluated solely on an academic basis, not on opinions or conduct in matters unrelated to academic standards.
>
> A. Protection of freedom of expression
> Students are free to take reasoned exception to the data or views offered in any course of study and to reserve judgment about matters of opinion, but they are responsible for learning the content of any course of study for which they are enrolled.
>
> B. Protection against improper academic evaluation
> Students are protected through orderly procedures against prejudice or capricious academic evaluation. At the same time, they are responsible for maintaining standards of academic performance established for each course in which they are enrolled.

118)    According to the summary report mailed to the Plaintiff, by Dr. Kris Young, vice-president of Academic Services, the Student Grievance Committee found that the rules of "Section II- in the Classroom" did not apply in the classroom setting.

119)     Parkland College established a "contract" with Plaintiff through the *Parkland College Policies and Procedures Manual* and in other implied manners. Parkland College failed to keep with the policies and procedures listed in *Parkland College Policies and Procedures Manual.* The Plaintiff suffered constitutional violations as a result of Parkland College's failure to uphold its portion of the contract. Plaintiff CCF paid his tuition and otherwise kept to the lawful portions of the contract between Parkland College and him. Defendants were aware of their own rules, and were duly reminded by the Plaintiff of their own rules. Plaintiff CCF was damaged as a result of the breach of contract in the forms of punishment, damage to his academic reputation, violations of his constitutional rights, and temporal and financial damages in the sense of time and costs associated with trying to reverse Defendant Sola's punishment and now the filing of this action.

120)     As to Plaintiff's Claim of Breach of Contract, Defendants did breach their contract with Plaintiff in spirit and in letter. Plaintiff entered into a contract with the Defendants. Plaintiff was required to tender funds, and in exchange Plaintiff was guaranteed certain protections. The Defendants breached the contract by not adhering to the guarantees that were listed in the contract. The Plaintiff, to the best of his reasonable abilities in light of his constitutional rights, performed his conditions of the contract. Plaintiff REPEATEDLY notified the Defendants in writing that Defendants were not following the LAWFUL policies and procedures established in the contract. Plaintiff suffered real and yet-to-be-realized damages as a result of Defendants' breach of contract. The Defendants did breach the contract between Parkland College and the Plaintiff.

## SIXTH CLAIM
### Negligence

121)     Plaintiff CCF restates and incorporates the above-stated facts herein.

122)     Defendants may argue that they were originally unaware of constitutional requirements protecting Plaintiff CCF's speech. However, Plaintiff CCF, in his original written grievance dated 12-8-2008 and his final combined appeal to Parkland's president and Board of Trustees dated 4-30-2009, listed guidance from the U.S. Department of Education-Office of Civil Rights, relevant case law, and the reasoning of the United States Supreme Court. So, Defendants' argument of ignorance would be an admission that they did not pay attention to Plaintiff's formal written grievance or his final appeal. Defendants should

have acted with due diligence to research whether Plaintiff had a valid argument. If Defendants were not cognizant of the applicability of constitutional rights in the academic setting, Defendants had a duty, at some juncture PRIOR to the final seal of approval on Plaintiff CCF's student grievance hearing, to seek the advice of Parkland's retained legal counsel. Defendants showed an intentional, negligent or constructed disregard in discharging their duties, at a public college in accordance with constitutional requirements.

123)   Defendant Thomas Ramage is being sued in both his official and individual capacities. Defendant Thomas Ramage, as Parkland College's president had an immediate duty to ultimately oversee the actions of his instructors, department chairs, administrators and grievance committees and to ensure that they were following Parkland College's rules and state and federal laws. Defendant Ramage failed either intentionally or through negligent inaction to perform his and assigned chores, in that he failed to give Plaintiff CCF's plight due consideration and to ensure that his charges were performing according to Parkland's rules and relevant constitutional requirements. The Plaintiff CCF submitted a 10-page appeal to Defendant Ramage, which contained numerous questions about policies and where specific rules did apply, since the grievance committee erred in applying Parkland College policies. Defendant Ramage replied briefly on 5-6-2009:

> "Thank you for your letter of April 30, 2009 regarding an appeal of the formal student grievance process. I have reviewed your appeal, the process employed by the grievance committee, and their findings.
>
> I find no cause to reverse the decisions of the committee.
>
> Good luck in your academic endeavors.
>
> Sincerely,
> Thomas R. Ramage, Ed.D
> President"

124)   Plaintiff CCF also submitted the same documentation addressed to the Board of Trustees through the assistant to the Board of Trustees on at least two occasions to advise them of the situation. Therefore, the Defendant -Board of Trustees was or should have been duly informed through their assistant of the unlawful situation that existed. Had Defendant Ramage and the Defendant Board of Trustees actually given due diligence to duties to assess the Plaintiff's final appeal, it is likely that we would not be before this court today. It is negligent if Parkland College's administrators are unfamiliar with the First Amendment and its applicability to collegiate academic institutions and equally negligent if they are

unfamiliar with the Parkland College policies and procedures. Otherwise, the dismissive approach taken by Defendant Ramage belittles and disrespects Plaintiff CCF, the United States Supreme Court rulings and the First Amendment. Defendant Ramage and the Defendant Board of Trustees acted in a negligent manner in that they owed Plaintiff CCF, a duty to act, according to Parkland College's rules, Illinois law, and the *United States Constitution*. The Defendant Board of Trustees and Defendant Ramage failed to act. Whether through intentional substantiation of the violation of the Plaintiff constitutional rights or through wanton negligent inaction, the Defendant- Board of Trustees and Defendant Ramage holds ultimate responsibility for approving and sustaining the constitutional insults endured by Plaintiff CCF.

125)   As to Plaintiff's Negligence Claim, Defendants Krall, Ramage and Parkland College Board of Trustees were all individually and collectively negligent. Each Defendant owed Plaintiff a "Duty of Care," that is each was to perform in a specific manner to assure Plaintiff of his rights and protections. Each of these Defendants demonstrated a "Breach of Duty," they failed to perform their listed duties. Their actions resulted in some of the violations of Plaintiff's rights, injuries, and the sustainment of violations and injuries to Plaintiff, thereby establishing causal connection. Defendants' actions cause Plaintiff's academic reputation to be harmed and damaged. The Plaintiff lost his good academic reputation at Parkland College, which in essence, threatens his future academic and employment potential. The Defendants actions are the direct and proximate cause of the violations, injuries and damages suffered by the Plaintiff. The listed Defendants were negligent.

# SEVENTH CLAIM
## Intentional and Negligent Infliction of Emotional Distress

126)   Plaintiff CCF restates and incorporates the above-stated facts herein.

127)   Defendant Sola's unconstitutional summary judgment and discipline of Plaintiff caused Plaintiff to suffer mental anguish and emotional distress.

128)   Defendant Myers' support of Defendant Sola and dismissive attitude of Plaintiff caused Plaintiff to suffer mental anguish and emotional distress.

129)   Defendant Randy Fletcher's support of Defendants Sola and Myers and dismissive attitude of Plaintiff caused Plaintiff to suffer mental anguish and emotional distress. Also, Defendant Fletcher told

the Plaintiff that he was going to waste a lot of people's time based upon principle. Defendant Fletcher's words aggravated Plaintiff for several reasons.

130) Defendant Marietta Turner's attempt to circumvent Plaintiff's due process rights involving 31-WFS' Harassment/Discrimination complaint and threatening pressure for Plaintiff to apologize whilst Plaintiff's own grievance was alive caused Plaintiff to suffer mental anguish and emotional distress.

131) Defendant Carolyn Ragsdale's blatant demonstration of impartiality, conclusive guilt and actually being the WORST ACCUSER of Plaintiff's written speech as "offensive," caused Plaintiff to suffer mental anguish and emotional distress. Defendant Ragsdale, a community college instructor, demonstrated a level of understanding of words that was inadequate, and then combined that inadequacy with ill-informed understanding of "freedom of speech" in order to berate the Plaintiff. Her actions were so outrageous and shocking that Plaintiff asked her several times to clarify her position. The recording from the hearing demonstrates such. In reality, Defendant Ragsdale's atrocious actions speak poorly for those charged with educating students at Parkland College and those allowed to sit on grievance committees.

132) Defendant Ramage's and the Defendant Board of Trustees' failure to act caused Plaintiff to suffer mental anguish and emotional distress. It simply cannot be true that all of Parkland College's administrators are unfamiliar with the First Amendment and its applicability to the academic institution and college students. Defendant Ramage and the Defendant Board of Trustees acted in a negligent manner in that they owed Plaintiff CCF, a duty to act,

133) As to Defendant's final Claim of Intentional and Negligent Infliction of Emotional Distress, Defendants wholly and individually acted in intention and negligent manners which inflicted immediate and delayed emotional distress upon the Plaintiff. Further, the repeated willful and wanton "outrageous conduct" for educators also added to that emotional distress. The Defendant restates and incorporates all of the above claims and assertions to establish the elements of this claim. The Defendants willfully engaged in negligent conduct by not familiarizing themselves with the basic components of freedom of speech for students. The Defendants demonstrated that it was inappropriate for them to address First Amendment issues. The Defendants prohibited the Plaintiff the right to argue the First Amendment of the *United States Constitution* during a grievance process which related to the freedom of speech and expression. The Defendants demonstrated that they had no concept or understanding of the First Amendment protections afforded college students, yet they professed to follow the law while improperly

punishing Plaintiff for his protected speech. Defendant Ragsdale demonstrated such outrageous conduct during the hearing that it cannot be overlooked. Her words made it clear to any reasonable person that her mind was made up before Plaintiff began his hearing presentation; she further demonstrated verbal and constitutional civics aptitudes which are clearly substandard for a college instructor. She was negligent for not educating herself properly before continuously and erroneously "educating" the Plaintiff about the freedom of speech and what constitutes "offensive" language. Defendant Ramage and the Defendant Parkland College-Board of Trustees are negligently and intentionally contributed to Plaintiff's emotional distress. When you unlawfully punish someone, deny him Due Process, create untruths about him, threaten his academic record, and then the supervisors fail to correct the action, a reasonable aggrieved person is likely to endure emotional distress. The Plaintiff endured and continues to endure mental anguish and emotional distress as a result of the Defendants actions. The Defendants willful violations of the basic standards of law-abiding and learned educators were the direct and proximate causes of Plaintiff's emotional distress.

## RELIEF REQUESTED

134)    Plaintiff CCF prays that this court grant and order the below-listed requests for judicial relief.

135)    Plaintiff CCF will promptly make a motion for the PRELIMINARY INJUNCTION to stay Plaintiff CCF's punishment, prohibit further punishment of Plaintiff based on his protected speech, and a prohibition against Parkland College from punishing any students based upon the facially overly broad and overly vague speech codes.

136)    That this court enter a DECLATORY JUDGMENT that public college and university students in the court's realm are afforded the protection of the First Amendment of the *United States Constitution*.

137)    That the court enter a FINAL ORDER that Defendant Travis Sola reverse his disciplinary punishment of Plaintiff CCF.

138)    That the court enter a FINAL ORDER that Defendants be enjoined from further punishing Plaintiff CCF for constitutionally-protected cognitive and emotive expressiveness and speech.

139)    That the court enter a FINAL ORDER that Defendants remove from Plaintiff CCF's academic records ANY and ALL annotations regarding this disciplinary manner.

140)    That this court enter a DECLATORY JUDGMENT that Parkland College's "Policy 8.26 HARASSMENT / DISCRIMINATION-STUDENTS" and "Policy 8.30 E-MAIL ACCESS AND USE,"

"Policy 3.40 COMPUTER/NETWORK USAGE"  are facially overly vague and overly broad, and therefore in violation of the First Amendment of the *United States Constitution* due to VAGUENESS and OVERBREADTH.

141)    That this court enter a FINAL ORDER dismissing the findings of the Parkland College's Student Grievance Committee for the Plaintiff due to inappropriately manufactured evidence, lack of PROCEDURAL and SUBSTANTIVE DUE PROCESS guaranteed by the Fourteenth Amendment and Defendants repeated inability to follow Parkland College's written policies.

142)    That this court enters a FINAL ORDER enjoining Defendants from enforcing the DEFECTIVE components of "Policy 8.26 HARASSMENT/DISCRIMINATION -STUDENTS" and "POLICY 8.30 E-MAIL ACCESS AND USE," "Policy 3.40 COMPUTER/NETWORK USAGE" based on their facially overbreadth and vagueness issues, which make them unconstitutional because of wide scopes of prohibiting protected speech and expressions, and that no students are punished under said policy.

143)    That Plaintiff CCF be awarded court costs and fees, costs associated with filing this claim, U, nominal damages, punitive damages, and any other damages deemed appropriate by this court against the Defendants who acted in outrageous manners and with reckless disregard for Plaintiff CCF's established rights and protections, while acting in both their OFFICIAL and INDIVIDUAL capacities.

**JURY DEMAND:**          Yes  ___    No   **X**

Prepared for Plaintiff CCF with significant input and assistance from "NLF."

Signed this  *6th*  day of __October__ , 2009.

Signature of Plaintiff: X— *Label Game*

Plaintiff, Pro se

Name of Plaintiff: Plaintiff CCF

Address: 605 Erin Drive, Champaign, IL 61822

Telephone Number: (217) 239-9817

%JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

**PLAINTIFF CCF**

## DEFENDANTS

PARKLAND COLLEGE-BOARD OF TRUSTEES; TRAVIS SOLA;
THOMAS RAMAGE; RANDY FLETCHER; MARIETTA TURNER;
AMY MYERS; BRYAN KRALL; CAROLYN RAGSDALE

**(b)** County of Residence of First Listed Plaintiff ___CHAMPAIGN___
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant ___CHAMPAIGN___
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
C.C. FEINE- Plaintiff, Pro se
605 Erin Drive, Champaign, IL 61822-8002
(217) 239-9817

Attorneys (If Known)

## II. BASIS OF JURISDICTION   (Place an "X" in One Box Only)

- ☐ 1  U.S. Government
Plaintiff
- ☒ 3  Federal Question
(U.S. Government Not a Party)
- ☐ 2  U.S. Government
Defendant
- ☐ 4  Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                        and One Box for Defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☒ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | Alien Detainee | | ☐ 950 Constitutionality of |
| | Other | | ☐ 465 Other Immigration | | State Statutes |
| | ☒ 440 Other Civil Rights | | Actions | | |
| | * First Amendment | | | | |

## V. ORIGIN   (Place an "X" in One Box Only)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
42 U.S.C. §1983: First Amendment & Fourteenth Amendement; 20 USC 1011 - Sec. 1011a.
Brief description of cause:
Defendants violated Plaintiff's First Amendment Rights and his rights to Procedural and Substantive Due Process; Defamation.

## VII. REQUESTED IN COMPLAINT:

- ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ UNSPECIFIED
Three Injunctions against Parkland College

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):   JUDGE ___N / A___   DOCKET NUMBER  09-2246  N/A

DATE  6 October 2009

SIGNATURE OF ATTORNEY OF RECORD
X _Loleh Feine_   / C.C. Feine - Plaintiff Pro se

FILED

## FOR OFFICE USE ONLY

RECEIPT # ___   AMOUNT ___   APPLYING IFP ___   JUDGE ___   MAG. JUDGE ___

OCT 6 2009

CLERK OF THE COURT
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS